Gordon A. GRAY, Plaintiff,

v.

DEPARTMENT OF EMPLOYMENT
SECURITY, Defendant.

Agnes PAYOTELIS, Plaintiff,

v.

DEPARTMENT OF EMPLOYMENT
SECURITY, Defendant.

Cathleen L. ALVARADO, Plaintiff,

v.

DEPARTMENT OF EMPLOYMENT
SECURITY, Defendant.

Steve E. CHYTRAUS, Plaintiff,

v.

DEPARTMENT OF EMPLOYMENT
SECURITY, Defendant.

Mary A. SCHOEN, Plaintiff,

v.

DEPARTMENT OF EMPLOYMENT
SECURITY, Defendant.

Nos. 19005, 19127, 19321, 19322
and 19346.

Supreme Court of Utah.

March 22, 1984.

John L. Black, Jr., Utah Legal Services, Salt Lake City, for plaintiffs.

Floyd G. Astin, K. Allan Zabel, Sp. Asst. Attys. Gen., Salt Lake City, for defendant.

HALL, Chief Justice:

These five unemployment compensation cases, having come to this Court as separate appeals, involve similar factual circumstances and identical legal issues and are therefore consolidated in the interest of judicial economy.

The factual scheme common to each of these cases is as follows. After losing their jobs, appellants applied to the Department of Employment Security (hereinafter "department") for unemployment compensation benefits. At the time they filed their claims for benefits, they were instructed *orally* by department personnel that they must, *inter alia,* make a determined number (i.e., either two or three) of in-person contacts with potential employers each week in order to retain their eligibility status. They further received *written* instructions at that time as to their responsibilities relative to receiving benefits. On the claim for benefits form, they certified to the following: "I understand that *I must personally seek work* and be able and available to accept full-time work. I received the Unemployment Insurance Claimant Guide explaining my rights and responsibilities." (Emphasis added.) The Unemployment Insurance Guide (hereinafter "Claimant Guide") contains the following instructions in this regard: "Make an active effort to look for work. An active effort means that you should contact *several employers in person each week* who would hire people in your occupational field." (Emphasis added.) Appellants also signed and received copies of a form entitled "Responsibilities While Claiming Benefits," which provides:

Seek work—I must make an active effort to look for full time work each week and will follow up on any job leads I am given by Job Service. An active effort, in part, means I will *personally contact employers* who would hire people in my occupation. Failure to do so may be considered as evidence that I do not have a genuine desire to find immediate employment.

After receiving benefits for several months, appellants were notified by mail that they were scheduled to be interviewed by the department for the purpose of reviewing their eligibility status. Included with this notice was an "Eligibility Review" form, which, *inter alia,* required the claimant to report the contacts, in person

or otherwise, he had made to secure employment during the previous 30-day period. The form also contained the following statement in boldface type: "Please complete this form accurately. *Your eligibility for unemployment insurance will be based in part on the information you provide.* Bring this form with you when you report for your interview." (Emphasis added.)

At their eligibility interviews, appellants signed a "Statement Regarding Claims For Benefits," wherein each acknowledged that during certain weeks his work search (as reported on the eligibility review form) did not satisfy the standard (i.e., several in-person contacts per week) that had been set at the time the initial claim was filed.

Within only a few days after their eligibility interviews, appellants received "Eligibility Determination and Overpayment Notice[s]" from the department, indicating that their unemployment benefits were suspended and that they were liable to the department for certain benefits received. The reason given in these notices for the denial of benefits was that apellants had failed to establish their "availability for work" pursuant to the dictates of the Employment Security Act.[1]

Appellants appealed the adverse department decisions, first to an appeals referee and then to the Board of Review of the Industrial Commission. On each level of appeal, certain of the appellants received partial relief, but none received total relief. Appellants are now before this Court pursuant to U.C.A., 1953, § 35-4-10, requesting further relief from the decisions of the board of review.

The following issues are raised by each of the appellants:

(1) Did appellant act in good faith to make an active and reasonable effort to secure employment?

(2) Is the "2 to 3 new, in-person contact rule" a valid legal standard? and

(3) Does the Fourteenth Amendment require that recipients of Utah unemployment compensation benefits be afforded a *Goldberg v. Kelly*[2] hearing prior to being deprived of such benefits?

In addition to these issues, appellant Gray raises a question regarding the propriety of the department's order that the overpayment of benefits be offset by deductions from future benefits payable to him.

## I. GOOD FAITH EFFORT TO SECURE EMPLOYMENT

 Appellants contend that notwithstanding their failure to satisfy the department's two- to three-new-in-person-contact requirement, they carried their burden of establishing the requisite "availability for work" by conducting a "good faith" search for employment. This contention rests upon their analysis of the following provision of the Employment Security Act:

An unemployed individual is eligible to receive benefits with respect to any week only if it has been found by the commission that:

. . . .

(c) He ... *acted in good faith in an active effort to secure employment....*[3]

(Emphasis added.) They point out that this provision requires a "subjective" analysis of the claimant's acts[4] and, further, that it

---

1. Specifically, U.C.A., 1953, § 35-4-4(c), which provides in pertinent part:

 An unemployed individual is eligible to receive benefits with respect to any week only if it has been found by the commission that:
 . . . .
 (c) He is able to work and *is available for work* during each and every week with respect to which he made a claim for benefits under this act . . . .

(Emphasis added.)

2. 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

3. U.C.A., 1953, § 35-4-4(c).

4. *See Gocke v. Wiesley,* 18 Utah 2d 245, 420 P.2d 44 (1966); *Denby v. Board of Review,* Utah, 567 P.2d 626 (1977).

is to be construed liberally[5] and administered to effectuate the purposes of the Act.[6] On the basis of this standard, appellants maintain that their efforts to secure employment were sufficient to establish the requisite "availability for work" (eligibility).

Appellants further assert that the in-person-contact requirement imposed by the department establishes a standard for eligibility that is inconsistent with the "good faith, subjective" standard required by the Act (§ 35-4-4(c)). They suggest that the in-person-contact standard is rigid and inflexible, thus requiring an "objective" rather than "subjective" analysis of the claimant's work search efforts.

■ Our scope of review of Industrial Commission decisions varies according to the nature of the issues involved. This first issue (and the second issue as well) presents a question of "mixed law and fact,"[7] as well as a "technical" question.[8] The appropriate scope of review of questions of this nature requires that we afford deference to the commission's "informed discretion"[9] and that we sustain the commission's decision so long as it "fall[s] within the limits of reasonableness or rationality."[10]

Appellants argue that their position on this issue is supported by judicial precedent in this as well as many other jurisdictions.

They cite, however, only one such precedent from this state, the case of *Gocke v. Wiesley.*[11] In that case, the claimant's work search over a 2-month period consisted of inquiries to her former employer, several telephone calls, two in-person contacts and written replies to newspaper box advertisements. The Court reversed the commission's denial of benefits to the claimant, reasoning as follows:

> There is nothing in the Referee's findings which will support any inference that she did not make a legitimate attempt to obtain work. Based upon her apparent clean work record, it seems reasonable and natural that she should look to her former employer in the first instance for re-employment. When that expectation did not materialize, the plaintiff acted reasonably in seeking employment elsewhere by personal application, telephone calls and written responses to newspaper advertisements. These affirmative acts are all in the record and the Referee's own findings of fact. Such efforts constitute a reasonable effort on her part to obtain work.[12]

The fact that the claimant in *Gocke* was considered eligible for benefits without having made weekly in-person contacts is not at all dispositive here. The in-person-contact requirement was not at issue in

5. See *Singer Sewing Machine Co. v. Industrial Comm'n,* 104 Utah 175, 134 P.2d 479 (1943), *reh'g denied,* 104 Utah 196, 141 P.2d 694 (1943).

6. The purposes of the Employment Security Act include lightening the burdens of unemployment and maintaining purchasing power in the economy. See *Johnson v. Board of Review of Industrial Comm'n,* 7 Utah 2d 113, 320 P.2d 315 (1958); U.C.A., 1953, § 35–4–2.

7. "Mixed questions of law and fact" have been described as "the 'application' of the findings of basic facts (*e.g.,* what happened) to the legal rules governing the case." *Utah Dep't of Admin. Servs. v. Pub. Serv. Comm'n,* Utah, 658 P.2d 601, 610 (1983).

8. In *Salt Lake City Corp. v. Department of Employment Sec.,* Utah, 657 P.2d 1312, 1316 (1982), a technical question was described as one "which call[s] for the exercise of expertise, born either *of* a technical background and training or

long experience in dealing with numerous similar problems." (Emphasis added.) The question as to whether an adequate job search in a particular profession has been conducted is one that calls for the "exercise of expertise." Inasmuch as the department has had "long experience in dealing with numerous" unemployed individuals in many professions and in assisting them in becoming re-employed, we consider it to be most qualified to make the determination of "availability for work." See also *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

9. *Id.*

10. *Supra* n. 7.

11. *Supra* n. 4.

12. *Gocke v. Industrial Comm'n, supra* n. 4, 420 P.2d at 47.

*Gocke* nor was it even mentioned. Moreover, there is no evidence before this Court to indicate that the disputed requirement was even in existence at the time *Gocke* was decided. The only support *Gocke* lends to appellants' argument is with respect to the subjective nature of the standard for determining eligibility. This point is, however, not in dispute. Thus, we conclude that the *Gocke* decision has no direct bearing upon the question of whether the in-person-contact requirement is a proper measure for determining the adequacy of a job search.

Appellants also cite several decisions from other jurisdictions wherein the claimant's eligibility to receive benefits was established on the basis of a work search effort much like that described in the *Gocke* decision, *supra*. [13] All but one of those decisions, however, are distinguishable upon the same grounds as *Gocke*, i.e., they do not involve an in-person-contact requirement. In the one case that does involve a similar requirement, *Hill v. District Unemployment Compensation Board*, [14] the court's rejection of the requirement appears to be grounded upon its rigid and inflexible application. [15]

The specific question before us at this point is whether the agency applied the requisite "subjective" test to determine appellants' eligibility. More specifically, we must determine whether the agency applied the in-person-contact requirement in accordance with the "subjective" statutory standard. These questions can be readily determined by examining the agency's (Department of Employment Security and Industrial Commission) decisions. In light of the differences in the decisions and circumstances of these five cases, we must examine each separately with regard to this issue.

1. *Payotelis*

■ Upon reviewing the agency's decisions in this particular case, we find no evidence whatsoever of a rigid or inflexible application of the in-person-contact requirement. To the contrary, we find that the department and the commission gave due consideration to the claimant's circumstances and, where warranted, made substantial modifications in their decisions to reflect those circumstances.

At her eligibility interview, claimant reported that during the previous 30-day period she had made only two in-person contacts and eight or nine telephone contacts to potential employers. On the basis of this report, her benefits were suspended, and an overpayment was assessed against her in the amount of $536 (representing the benefits she had wrongfully received during the 4-week period beginning October 3 and ending October 30). Subsequently, claimant tendered to the appeals referee a supplemental list of in-person and telephone contacts that she alleged was given to the department at her eligibility review, but apparently was lost or overlooked by the department. Based upon this supplemental information, the appeals referee modified the decision, finding claimant ineligible to receive benefits during a 3-week period prior to the eligibility review, rather than a 4-week period, thus reducing the overpayment assessment to $402.

We further note the following conclusion of the appeals referee with respect to appellant Payotelis' claim for benefits during the period subsequent to October 30:

It was the claimant's contention on appeal that she had to suspend her work

---

**13.** *Employment Security Administration, Board of Appeals v. Smith*, 282 Md. 267, 383 A.2d 1108 (Md.App.1978); *Cascade Steel Rolling Mills, Inc. v. Employment Div.*, 26 Or.App. 863, 554 P.2d 549 (1976); *Bloomfield v. Employment Div.*, 25 Or.App. 771, 550 P.2d 1400 (1976); *Hill v. District Unemployment Compensation Board*, 302 A.2d 226 (D.C.App.1973).

**14.** *Supra* n. 13.

**15.** In footnote 4 of the *Hill* opinion, the court, in rejecting the three-contacts-per-week requirement imposed upon the claimant, emphasized the fact that the requirement had been applied in the form of a "condition precedent," which, we conclude, constitutes a rigid and inflexible standard.

search in late November as she had no money for gas and had been forced to sell a number of belongings in order to survive financially as she had been a number of weeks without unemployment insurance compensation or any other source of income. However, as the claimant supplemented her one in-person contact by only "a few" telephone calls, she has failed to demonstrate a continuing attachment to the labor market beyond November 27, 1982.

This conclusion evidences a subjective application of the in-person-contact requirement. It indicates a willingness on the part of the department to bend the requirement under unusual or extenuating circumstances on the condition that the claimant manifest a genuine attachment to the labor market by other sufficient means.

## 2. *Gray*

■ The agency's decisions and the precipitating circumstances in this case are very similar to those of Payotelis. Again, we find nothing to suggest a rigid or objective application of the in-person-contact requirement.

The department suspended Gray's benefits and assessed an overpayment of $498 against him on the basis of his report that he made only three new employer contacts, in-person or otherwise, in the 30 days prior to his eligibility review with the department. Thereafter, on subsequent levels of appeal claimant submitted lists of additional contacts he had purportedly made during the 30-day period originally in question, as well as the period that followed. Furthermore, appellant Gray claimed, as did appellant Payotelis, that he was unable to continue making in-person contacts due to his desperate financial situation.

That claimant's circumstances were analyzed subjectively and that the in-person-contact requirement was applied in a flexible manner are evidenced by the board of review's decision to modify the department's decision to the extent that benefits be allowed for a particular week in which claimant, under financial stress, made only one in-person contact but numerous telephone contacts.

## 3. *Chytraus*

■ In this case, the primary dispute involved the claimant's notice and understanding of the in-person-contact requirement. Claimant contended that he was not given oral instructions to make two to three in-person contacts each week and that he did not interpret the written instructions regarding "personal contacts" to mean "more-than-one in-person contact" per week.

Claimant's 30-day report for the period beginning December 26, 1982, and ending January 25, 1983, included in-person contacts as follows: one during the week ending January 1; none during the week ending January 8; two during the week ending January 15; none during the week ending January 22; and one during the week ending January 29. The report also indicated that one resume had been mailed on January 17. This search was considered inadequate by the department, except for the week ending January 15 when two in-person contacts were made, and claimant was assessed a $417 overpayment. At the hearing before the appeals referee, claimant submitted additional information relative to his work search: on December 28, he mailed an application, and on January 28, he followed through on a department referral. Notwithstanding, the appeals referee affirmed the department's decision.

Concerning appellant Chytraus' claim that he did not receive notice of or understand the in-person-contact requirement, the appeals referee concluded:

The information provided the claimant states he must make an active effort to secure work by contacting several employers in person each week. While this does not specifically state he must make a minimum of two to three contacts each week it is difficult to see how one contact in a six day period could be construed as an active search covering several employers.... [T]he claimant only made mini-

mal efforts and it is considered the department's denial was in order.

We do not interpret this conclusion to be a rigid and inflexible application of the in-person-contact requirement. There were no circumstances pled here to justify the claimant's minimal efforts. The referee clearly based his decision on an analysis of all the circumstances and determined, as he should have, that claimant's efforts and excuses were inadequate.

#### 4. *Schoen*

■ That the agency considered the circumstances surrounding claimant's efforts to secure employment and applied the in-person-contact requirement in a subjective manner in this case is clearly and adequately illustrated in the findings and conclusions entered by the appeals referee and adopted by the board of review:

FINDINGS OF FACT:

. . . .

... The claimant testified that she was instructed by an interviewer on or about November 1, 1982 to seek work through resumes and cover letters supplemented with personal interviews as often as she could obtain them since this type of search was more appropriate for someone with her experience and education. The claimant stated that the resume method was the most appropriate method of seeking employment at her level of expertise.

. . . .

REASONING AND CONCLUSION OF LAW:

. . . .

... Given the instruction of the Form 601–D to make three contacts each week coupled with the verbal instructions on the appropriateness of a resume search, it is held that the claimant will be allowed benefits for any week in which she made three resume searches or a combination of resume and in person work searches.

On the basis of the foregoing, claimant was in fact awarded benefits for a particular week during which she made only three resume searches and no in-person contacts.

#### 5. *Alvarado*

The denial of benefits in this case was occasioned not only by the claimant's failure to satisfy the in-person-contact requirement, but by her failure to show sufficient efforts of any kind, in-person or otherwise, to secure employment.

Appellant Alvarado's benefits were suspended and an overpayment in the amount of $164 was assessed against her on the basis of her report that during a 2-week period her search for work consisted of a single in-person contact. She further reported that the reason her efforts had been so minimal during this 2-week period was that her car needed repairs and she had no other form of transportation. She did not at that time (at the eligibility interview) claim to have made any other efforts by methods other than in-person contacts to secure employment.

At her subsequent hearing before an appeals referee, appellant was asked why she had not used bus transportation to make the requisite in-person contacts. She replied that she did not have the money for bus fares. She also testified that, notwithstanding her inability to make in-person contacts during the 2 weeks in question, she did continue to seek employment through other methods, to wit: looked in the newspaper, talked with friends and *may have* made several telephone calls to potential employers. These additional efforts were not, however, considered by the appeals referee to be sufficient, even under the difficult circumstances (transportation) described by appellant. They were indefinite and unspecific and thus inadequate to establish an active, good faith search for work. The department's decision was therefore affirmed.

■ This decision evidences a careful, subjective analysis of all the circumstances and factors (only one of which was the in-person-contact requirement) surrounding the claimant's search for work. We find no evidence in the record to support appel-

lant's contention that the sole basis for the determination of eligibility was the claimant's failure to satisfy the in-person-contact requirement.

From the foregoing, we conclude that the in-person-contact requirement has been applied in these five consolidated cases in a "subjective" manner consistent with the "good faith" statutory standard. Furthermore, in deference to the agency's "informed discretion" in these matters, we conclude that its subjective analysis in each case was "within the limits of reasonableness [and] rationality."

## II. VALIDITY OF IN–PERSON–CONTACT REQUIREMENT

This second contention represents yet another challenge to the validity of the department's in-person-contact requirement. Appellants contend that the requirement is void because at the time it was applied in these cases it had not been properly promulgated as an agency rule pursuant to the Utah Administrative Rule-making Act.[16] According to the Rule-making Act, prior to the adoption, amendment or repeal of any rule by a state agency, the agency must provide notice of its intended action, an opportunity for public comment and a public hearing. The rule must then be filed with the state archivist, published and ultimately codified in the department's Rules of Adjudication.

██ The agency maintains that the in-person-contact requirement was, at all times pertinent hereto, nothing more than an interpretive guideline and, as such, did not require formal promulgation under the Rule-making Act. We are in agreement with the agency's position for the reasons that follow.

In our discussion on "scope of review" in *Salt Lake City Corp. v. Department of Employment Security, supra,* we acknowledged the department's authority to interpret the Employment Security Act:

[W]here the language of a statute indicates a legislative intention to commit broad discretion to any agency to effectuate the purposes of the legislative scheme, *we will not substitute our judgment for that of the agency as long as the commission's interpretation has* "warrant in the record" and a "reasonable basis in the law." Furthermore, where agency decisions deal with technical questions which call for the exercise of expertise, born either of a technical background and training or long experience in dealing with numerous, similar problems, *we also accord deference to an agency interpretation* because of the necessity to recognize discretion commensurate with the nature of the issue, as defined by the general purposes of the Act, although the latitude accorded may vary with the nature of the issue. *SEC v. Chenery Corp.,* 332 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995] (1947), provides an example. The statutory language required that before the Commission could give approval to a plan of reorganization of a utility holding company, the Commission was required to determine among other things that the plan was "fair and equitable." 332 U.S. at 204 [67 S.Ct. at 1581]. The standard of review under such legal criteria was based on *deference to the "informed discretion" of the Commission* and permitted reversal of the Commission's ruling only upon a plain abuse of its discretion. *Id.* at 208 [67 S.Ct. at 1583].[17]

(Citations omitted.) Such interpretations do not necessarily always rise to the level

---

**16.** U.C.A., 1953, § 63–46–1, *et seq.* It is to be noted that subsequent to the administrative adjudication of the cases presently before us the Department of Employment Security promulgated a two- to three-new-in-person-contact rule in accordance with Utah's Administrative Rule-making Act. The new rule, which took effect on April 5, 1983, creates a rebuttable presumption that a claimant has not made a "good faith ...

active effort to secure employment" if the claimant fails to make a specific number of in-person employer contacts after being instructed to do so by department personnel. This rule does not affect the cases at bar.

**17.** *Supra* n. 8, at 1316.

of general rules of applicability requiring formal promulgation proceedings. Some are no more than informal guidelines applied subjectively to implement agency rules or statutory provisions. As such, they may not require formal promulgation. In light of our determination under the previous point of this appeal, i.e., that the in-person-contact requirement was applied in a flexible and subjective manner, we conclude that said requirement constitutes the latter species of agency interpretation and thus was valid without formal promulgation.

## III. NECESSITY OF A PRETERMINATION HEARING

The third contention raised by the appellants is that the suspension of their unemployment insurance benefits without a pretermination evidentiary hearing amounts to a violation of rights secured to them by the due process clauses of the United States Constitution and the Constitution of the State of Utah and by the Social Security Act, 42 U.S.C. § 503(a)(1) & (3).

The prerequisites to the application of due process protections are: (1) state action and (2) a constitutionally protected liberty or property interest.[18] That state action was present here by virtue of the application and enforcement of a Utah statute (Employment Security Act) is undisputed. As to the latter prerequisite, appellants claim that the expectation of continued unemployment compensation benefits is a "constitutionally protected property interest."

The concept of "property interests," in the "benefits" context, was defined by the United States Supreme Court as follows:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people must rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.[19]

Although the Court has never held explicitly that this definition encompasses unemployment compensation benefits, it has done so implicitly. In *Steinberg v. Fusari*,[20] a federal district court held that the procedure utilized by the state of Connecticut for determining a claimant's continuing eligibility to receive unemployment benefits violated due process protections. *Infra.* While the case was pending before the Supreme Court, the Connecticut legislature revised the disputed procedure. In light of this revision, the case was remanded to the district court for reconsideration. In so doing, the Court observed:

Identification of the precise dictates of due process requires consideration of both the governmental function involved and the private interests affected by official action.... In this context, the possible length of *wrongful deprivation of unemployment benefits* is an important factor in assessing the impact of official action on the private interests.[21]

(Emphasis added; citations omitted.)

We interpret the Court's action in *Fusari*, specifically the language quoted therefrom above, just as it was interpreted by the Supreme Court of Virginia in a very similar case entitled *Klimko v. Virginia Employment Commission:* [22]

While sufficiency of the procedures was the only due process question before the Court, *this language appears to be a tacit acknowledgment that the expecta-*

---

**18.** *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**19.** *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

**20.** 364 F.Supp. 922 (D.Conn.1973).

**21.** *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521, *reh'g denied,* 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975).

**22.** 216 Va. 750, 222 S.E.2d 559 (1976).

*tion of continued unemployment compensation benefits may constitute a property interest within the protection of the procedural due process guarantees of the Constitution.*[23]

(Emphasis added.) The Virginia court further observed: "[B]ecause the [Supreme] Court has never explicitly decided this question, we shall assume, without deciding, that the expectation of continued unemployment compensation benefits is a protected property interest."[24] We draw the same assumption, also without deciding the issue. We therefore conclude that appellants are justified in seeking the constitutional protections afforded by procedural due process.

The applicability of the Social Security Act has been aptly explained as follows:

The unemployment compensation program is jointly operated by the federal and state governments. States administer the program pursuant to their own unemployment compensation laws but must adhere to federal guidelines in so doing. The federal government provides no substantive benefits but does pay the entire cost of administering the program provided that the state conforms to the federal requirements. 42 U.S.C. § 1101(c)(1); 42 U.S.C. § 503(a); 26 U.S.C. § 3304.[25]

Having determined that both procedural due process and the Social Security Act apply in the present context, we must now identify their precise dictates. More specifically, we must determine whether the present system, which affords claimants a post-termination evidentiary hearing, satisfies both the statutory and due process requirements or whether a pretermination hearing is necessary.

A. Social Security Act

The specific requirements of the Social Security Act relevant to the present inquiry are set forth in 42 U.S.C. § 503(a)(1) & (3). Subsection 503(a)(1) requires that state unemployment compensation laws provide a method of administration "reasonably calculated to insure full payment of unemployment compensation when due." Subsection 503(a)(3) further requires the state to insure "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied."

Appellants' argument that a pretermination evidentiary hearing is essential to satisfy these statutory requirements is purportedly supported by the United States Supreme Court decision, *California Department of Human Resources v. Java.*[26] In *Java,* the initial administrative determination of the claimant's eligibility to receive unemployment benefits was protested by the employer, and an appeal was lodged. Pursuant to California procedure, the claimant's benefits were suspended pending the resolution of the employer's appeal. The Supreme Court found that this procedure violated the "when due" clause of § 503(a)(1) and held:

"When due" was intended to mean at the earliest stage of unemployment that such payments were administratively feasible after giving both the worker and the employer an opportunity to be heard.

. . . .

... Paying compensation to an unemployed worker promptly after an initial determination of eligibility accomplishes the congressional purposes of avoiding resort to welfare and stabilizing consumer demands; delaying compensation until months have elapsed defeats these purposes. It seems clear therefore that the California procedure, which suspends payments for a median period of seven weeks pending appeal, after an initial determination of eligibility has been

---

**23.** *Id.* 222 S.E.2d at 565.

**24.** *Id. See also Graves v. Meystrik,* 425 F.Supp. 40, 47 (E.D.Mo.1977).

**25.** *Dunn v. New York State Dep't of Labor,* 474 F.Supp. 269, 272 (S.D.N.Y.1979). *See also* U.C.A., 1953, § 35–4–11(k).

**26.** 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971).

made, is not reasonably calculated to insure full payment of unemployment compensation when due.[27]

Appellants further point out that the period of time their benefits were suspended pending administrative appeal either exceeded or was at least comparable to the 7-week period denounced by the Court in *Java*.[28]

The appellants' reliance upon *Java* is misplaced. The basis of the Court's decision there was not, as appellants purport, that the California procedure did not provide a pretermination evidentiary hearing; rather, it was that the median period during which eligible claimants' benefits were suspended pending the outcome of an *employer* appeal was excessive. Nothing in that opinion suggests that a post-termination hearing, which is held promptly after the suspension of benefits and provides for a prompt resolution, would be violative of § 503(a)(1).

As a result of the standard of "promptness" articulated in *Java*, federal regulations were formulated to reflect the necessity for timeliness in all phases of the administrative process. These "Federal Standards For Appeals Promptness" (hereinafter "Promptness Standards") currently require that 60 percent of all first-level appeal decisions be rendered within 30 days of the date of appeal and that 80 percent of all first-level appeal decisions be rendered within 45 days of the appeal.[29]

In light of these regulations, in order for appellants to prevail on their argument that the time lapse between the date of their appeals and the date of the decisions was excessive, they must not merely show that said time lapse was equivalent to that in *Java* or any other case that has held the time lapse to be excessive (*e.g.*, *Steinberg*

*v. Fusari, infra*), they must offer evidence that the department has failed to meet the federally mandated "Promptness Standards." In the instant cases, we find no such evidence.

The *Java* decision is also distinguishable upon its facts. The instant cases involve *employee* appeals following administrative determination of *eligibility*. Benefits were suspended in these cases only after ineligibility had been determined on the basis of disqualifying facts and circumstances provided by appellants (employees) themselves. On the other hand, *Java* involved an *employer* appeal following an administrative determination of *eligibility*. Benefits in that case were suspended automatically upon the filing of said appeal without any prior administrative determination of ineligibility.[30] For the foregoing reasons, *Java* is inapposite to the present issues.

Appellants place further reliance upon a federal district court decision that was rendered several months subsequent to *Java*. In *Wheeler v. State of Vermont*,[31] the court held that the system of administration employed by the state of Vermont was not "reasonably calculated to issue full payment of unemployment compensation when due." (Social Security Act.) Among the reasons for this decision were those advocated here by appellants, to wit: a pretermination hearing must be afforded the claimant prior to the suspension of benefits, and the time lapse between the date of appeal and the date a decision as to eligibility is rendered by the agency cannot be excessive.[32]

■ We decline to follow the *Wheeler* decision for two reasons. The first is that the requirement of a pretermination hearing does not comport with Supreme Court

---

**27.** *Id.* at 131, 133, 91 S.Ct. at 1353, 1355.

**28.** The time lapse from appeal to decision (at the first administrative appellate level) in each of these consolidated cases was as follows: (1) Payotelis, 23 days; (2) Gray, 39 days; (3) Chytraus, 48 days; (4) Schoen, 46 days; and (5) Alvarado, 49 days.

**29.** 20 C.F.R. § 650.4(b).

**30.** *See Wilson v. Board of Ind. Employment Sec. Div.*, 270 Ind. 302, 385 N.E.2d 438 (1979).

**31.** 335 F.Supp. 856 (D.Vt.1972).

**32.** In *Wheeler*, the court held that the Vermont agency's average time lapse of 37.5 days was excessive.

decisions on this subject. Although the High Court has never made an explicit statement with respect to the necessity of a pretermination hearing under the Social Security Act, it has on several occasions done so implicitly. In *Java*, for example, implicit in the Court's statements, *supra*, i.e., that compensation must be made "promptly" to the unemployed worker and that a suspension of benefits for "several months" (or 7 weeks) is excessive, is the idea that payment of benefits within a reasonable time and a suspension of benefits during a reasonable period of time pending administrative review would be consistent with the dictates of the Social Security Act.

Another indication of the Supreme Court's approval of a post-termination hearing procedure that begins promptly after a suspension of benefits and provides for a prompt resolution is found in *Torres v. New York State Department of Labor.*[33] On the district court level, the court rejected arguments that the New York procedural scheme, which provided a post-termination hearing similar to those at issue here, failed to satisfy both due process and § 503(a)(1) requirements. While the case was pending before the Supreme Court, the *Java* decision was rendered. Inasmuch as *Java* interpreted the "when due" requirement of § 503(a)(1), the Court remanded the *Torres* decision for reconsideration in light of *Java.* On remand, the district court adhered to its former position on both the constitutional and statutory questions. With respect to the statutory issue, it distinguished *Java* upon its facts. Describing an almost identical factual and procedural scheme as we have here, the court held:

> The benefits were suspended on the basis of new ' factual circumstances which could not have been considered at the original eligibility interview. The *Java* decision is therefore irrelevant to plain-

tiff Dinger: not only was the eligibility redetermination based on new facts, but the plaintiff supplied the insurance office with those very facts at an administrative interview. This administrative procedure for redetermining that benefits were not "due" fully comports with the requirement of 42 U.S.C. § 503(a)(1) (1970).[34]

This second opinion of the district court was later resubmitted to the Supreme Court and was summarily affirmed.[35]

The second reason for not following the *Wheeler* decision on this issue is that it was decided prior to the promulgation of the "Federal Standards for Appeals Promptness."[36] In determining whether this state's administrative appeal procedure is sufficiently prompt, we must measure that procedure against the "Promptness Standards," rather than against the 7-week *Java* standard or the 37.5-day *Wheeler* standard. Thus, we find this aspect of the *Wheeler* decision irrelevant to the instant cases.

For the reasons stated above, we hold that the post-termination evidentiary hearing procedure employed by the department in these cases fully comports with the "when due" requirement of § 503(a)(1).

## B. Due Process

Of the requirements of due process, the Supreme Court has said: "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."[37] "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."[38]

Appellants contend that the minimal procedural protection demanded by due process in the present context is a pretermina-

---

**33.** 402 U.S. 968, 91 S.Ct. 1685, 29 L.Ed.2d 133 (1971).

**34.** 333 F.Supp. 341, 344 (S.D.N.Y.1971).

**35.** 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972).

**36.** *Supra* n. 29.

**37.** *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

**38.** *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

tion evidentiary hearing. They rely principally upon *Goldberg v. Kelly*,[39] wherein the Supreme Court held that *welfare benefits* could not be terminated without first providing the recipient with a pretermination hearing. They acknowledge the clear distinction between the *welfare benefits* at issue in *Goldberg* and the *unemployment compensation benefits* at issue here, but argue that the distinction, insofar as the dictates of due process are concerned, is ineffectual. This argument is purportedly supported by two district court decisions, *Wheeler v. State of Vermont, supra,* and *Steinberg v. Fusari.*[40]

As indicated previously, *Steinberg* involved a constitutional (due process) attack upon the Connecticut system of terminating unemployment compensation benefits. Under the Connecticut system, a claimant's continued eligibility was determined on the basis of a biweekly report submitted in person by the claimant to the unemployment compensation office. This report consisted of two written forms—one containing a sworn statement that the claimant had been available for work and had made reasonable efforts to obtain employment during the previous 2-week period, and the other containing a list of the employers contacted by the claimant during the period in question. If, upon receipt of this report, the paying official determined that the claimant's eligibility was questionable, the claimant would be directed to a "seated interview" with a fact-finding examiner. The examiner would then conduct a more thorough inquiry into the factors bearing upon the claimant's eligibility. If he determined that the claimant had maintained his eligibility status during the period in question, benefits were tendered immediately; however, if the examiner reached the opposite conclusion, benefits were withheld.

Benefits for the period in question were normally withheld pending resolution of the administrative appeal, provided an appeal was filed.[41]

The district court held that this system violated due process because "(a) a property interest [had] been denied (b) at an inadequate hearing (c) that [was] not reviewable de novo until an unreasonable length of time." [42] The court went on to suggest certain methods whereby the state could bring its procedures into compliance with the due process clause:

> [I]t can provide for an expedited hearing *de novo....* [I]t can bring the initial hearing procedures up to a minimum standard of fairness. In this regard, essential fairness can be expeditiously achieved in some instances by setting forth and communicating to claimants in advance a quantifiable standard concerning reasonable effort to find employment. For example, if a stated number of employers must be visited, a claimant's acknowledgement that he had seen fewer than the required number would eliminate the factual controversy and provide an adequate basis for denial of benefits.[43]

It is to be noted that no suggestion or guideline was given in this decision with regard to a pretermination hearing.

The *Steinberg* decision was later appealed to the Supreme Court. While said appeal was pending, Connecticut enacted major revisions in its unemployment insurance procedures. The Court noted the new procedures as follows:

> *The amended statute provides for the creation of a staff of referees to review the examiners' decisions de novo.* Referees are to be appointed by an Employment Security Board of Review, the

---

**39.** *Supra* n. 2.

**40.** *Supra* n. 20.

**41.** In its review of the Connecticut system, the district court found that the average delay in resolving claimant appeals was 126 days. It also found that 99.4 percent of the intrastate appeals at the first administrative appellate level

took more than 45 days from appeal to decision and that 97.4 percent took more than 75 days. These delays were considered excessive and thus violative of due process.

**42.** *Supra* n. 20, at 937, 938.

**43.** *Id.*

three members of which are appointed by the Governor. The statute further provides that the referee section "shall consist of such referees as the board deems necessary for the *prompt processing of appeals hearings and decisions and for the performance of the duties imposed by this act.*" Appeals from the referees' decisions are to be taken to the Employment Security Board of Review and thereafter to the state courts.

The legislative history indicates that the Connecticut Legislature anticipated that *these amendments would have a significant impact on the speed and fairness of the resolution of contested claims....* Particular emphasis was placed on the need to improve the State's treatment of administrative appeals. *It was recognized that Connecticut's torpid system of administrative appeal was markedly inferior to those used in other States.* Revision of the appellate system was designed to remedy that problem. In the words of one member of the House: "The bill ... *sets up a unique system which is designed to cut down that [appellate] backlog.*"[44]

(Citations omitted; emphasis added.)

In light of these revisions, the Court vacated the decision of the district court, remanded the cause for reconsideration and stated:

"The formality and procedural requisites for [a due process] hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *In this context, the possible length of wrongful deprivation of unemployment benefits is an important factor in assessing the impact of official action on the private interests. Prompt and adequate administrative review provides an opportunity for consideration and correction*

of errors made in initial eligibility determinations.

Thus, *the rapidity of administrative review is a significant factor in assessing the sufficiency of the entire process.*[45]

(Emphasis added.)

■ We adopt the following view with respect to the *Steinberg* decision and hold it to be dispositive of the issue before us:

Implicit in the Supreme Court's holding in *Steinberg* is the idea that procedural due process does not require a full evidentiary hearing prior to the discontinuance of benefits as contended by appellant in the present case. The *Steinberg* court simply remanded the case for reconsideration in light of revisions in Connecticut law. These revisions did not provide for a full *pre*-termination hearing, but rather, they were merely designed to speed up the time in which a *post*-termination hearing was afforded. If the Supreme Court was of the opinion that a pre-termination hearing was constitutionally required, they would not have remanded the *Steinberg* case for further consideration in light of revisions which did not even provide for such a hearing. Thus, it is clear that all that is required by the Due Process Clause is a procedural scheme whereby a claimant is afforded a full evidentiary hearing within a reasonable time after the termination of benefits.[46]

In light of what we consider to be the Supreme Court's position on the instant due process issue, we decline to follow the contrary position taken by the district court in *Wheeler.*

The question remaining with respect to the due process issue is whether the procedures employed by this state provide adequate notice to the claimant and a full

44. *Supra* n. 21, 419 U.S. at 385–86, 95 S.Ct. at 537–38.

45. *Id.* at 389, 95 S.Ct. at 539.

46. *Supra* n. 30, 385 N.E.2d at 445. *Accord Graves v. Meystrik, supra* n. 24. *See also Mathews v. Eldridge, supra* n. 18, wherein the Su-

preme Court, confronting a similar due process argument (involving the termination of disability benefits), stated, "Only in *Goldberg* has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation." *Id.* 424 U.S. at 340, 96 S.Ct. at 905.

hearing within a reasonable time after his benefits have been terminated.

■ As to notice, we previously pointed out that at the time the claimant makes his initial claim for benefits he receives specific oral and written instructions with respect to his responsibilities in remaining eligible for benefits (*e.g.*, several in-person contacts per week—a "quantifiable standard." *See Steinberg, supra*). Furthermore, prior to the eligibility interview with the department, the claimant is given written notice to the effect that he must report his efforts to secure employment accurately and that his eligibility for unemployment insurance will be based in part on the information he provides. We conclude that such forms of notice are adequate.

■ Respecting the time lapse from appeal to decision on the administrative appellate level, respondent claims that on the average decisions are rendered well within the limits established by the federal "Promptness Standards." This contention is supported by the record, and appellants do not argue to the contrary. Furthermore, this state's system of administrative appeals comports with that which was apparently sanctioned by the Supreme Court in *Fusari v. Steinberg, supra.* We therefore conclude that the post-termination evidentiary hearing utilized in this state fully complies with the dictates of procedural due process.

## IV. PROPRIETY OF OFFSETTING OVERPAYMENTS BY DEDUCTING FUTURE BENEFITS

We turn now to appellant Gray's question with regard to the propriety of the department's method of recouping overpayment of benefits. More specifically, Gray claims that the deduction of *100 percent* of his future benefits to recoup the overpayment made to him was excessive and thus an abuse of the department's discretion.

■ Section 35-4-6(d) of the Employment Security Act provides in this regard:

If any person, by reason of his own fault, has received any sum as benefits under this act to which under a redetermination or decision pursuant to this section, he has been found not entitled, he shall be liable to repay such sum, and/or *shall*, in the discretion of the commission, *be liable to have such sum deducted from any future benefits payable to him.*

(Emphasis added.) The language of this section clearly and unambiguously makes it the prerogative of the commission to determine the sum or percentage of future benefits to be deducted in the case of an overpayment. In this case, appellant Gray received benefits to which he was not entitled due to his own failure to comply with the department's work search requirements. A recoupment of those benefits by deducting 100 percent of an equivalent sum of benefits otherwise due left Gray in no worse position than he would have been in had he not received the overpayment in the first place. We find no abuse of discretion and therefore no reason to disturb the commission's prerogative.

We affirm the board of review's decisions in these consolidated cases.

STEWART, OAKS and HOWE, JJ., concur.

DURHAM, Justice (concurring and dissenting):

I concur in Parts II and IV of the majority opinion, but dissent from Part III and portions of Part I.

In Part III, the majority opinion holds that the procedures used to terminate appellants' unemployment benefits do not violate due process rights under the Utah Constitution, the United States Constitution, or the Social Security Act, 42 U.S.C. § 503(a)(1) and (3). I believe that the majority is mistaken in its analysis on both questions and, further, I believe that a due process analysis under the Utah Constitution alone would be appropriate.

### I

Regarding the question of compliance with the Social Security Act, the majority relies upon the federal promptness stan-

dards and on the summary affirmance in *Torres v. New York State Department of Labor*, 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972), for the proposition that "the requirement of a pretermination hearing does not comport with Supreme Court decisions on this subject." I believe, first, that the delays in appellants' cases do not comply with the promptness standards and, second, that the majority's conclusion regarding U.S. Supreme Court opinions on this question is unwarranted. The majority, in footnote 28, computes the delays in these five cases within a range of 23 to 49 days. These periods are apparently calculated by taking the time between the date of filing an appeal to the date of decision at the first administrative appellate level. As the majority opinion itself notes, however, the concern of the U.S. Supreme Court in *Java* was about the median period during which eligible claimants' benefits were *suspended* pending a decision on appeal. *California Dept. of Human Resources v. Java*, 402 U.S. 121, 133, 91 S.Ct. 1347, 1355, 28 L.Ed.2d 666 (1971). When the date of termination or suspension of benefits, rather than the notice of appeal, is used in these five cases, the periods of delay for these appellants do not comply with the promptness standards. Those periods are: (1) Payotelis: 56 days; (2) Gray: 41 days; (3) Chytraus: 43 days; (4) Schoen: 50 days; and (5) Alvarado: 62 days.[1] In addition, the majority's analysis of the significance of the *Torres* opinion at the trial level and summary affirmance by the U.S. Supreme Court does not square with subsequent comments by that Court. The trial court in *Torres* relied on the fact that New York's system provided for a periodic redetermination of eligibility for benefits and reasoned that benefits were therefore not "due" under 42 U.S.C. § 503(a)(1) until each redetermination was completed, as set forth in the majority opinion. Notwithstanding the Court's summary affirmance (in a 6–3 vote) of the *Torres* holding, Justice Powell,

speaking for the Court, later appeared to disavow support for that rationale. In footnote 15 of the majority opinion in *Fusari v. Steinberg*, 419 U.S. 379, 388, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975), the Court criticized the district court for reaching the same conclusion advocated by the majority opinion here:

15. The District Court interpreted our summary affirmance in *Torres* to indicate that benefits are not "due" under § 303 until administratively deemed payable. 364 F.Supp., at 930. While this is a plausible reading of the evolution and affirmance of *Torres*, it is not one that we can endorse. Such a definition of the "when due" requirement of federal law would leave little vitality to *Java* and would nullify the congressional intention of requiring prompt administrative provision of unemployment benefits. See 402 U.S., at 130–133 [91 S.Ct., at 1353–1355]. By reading our summary affirmance in *Torres* at its broadest, the District Court heightened the tension between that judgment and our more considered disposition of *Java*. A narrower interpretation of *Torres* would have been appropriate.

Any statutory requirement that embodies notions of timeliness, accuracy, and administrative feasibility inevitably will generate fact-specific applications. In this instance, many of the factual distinctions that the District Court relied on to distinguish *Torres* on the constitutional issue apply equally to the "when due" question. For example, the delay in resolving administrative appeals is considerably greater in Connecticut than in the New York system, where administrative appeals were resolved in an average of 45 days. See *Torres v. New York State Dept. of Labor*, 321 F.Supp. 432, 439 (S.D.N.Y.1971). And, as the District Court observed, the *Torres* court apparently did not consider the probable accuracy of the challenged procedure in de-

1. In several of these cases, benefits were actually terminated retroactively to dates considerably earlier than the notice. Since the claimants had already received past benefits, however, that additional time should probably not be included in the period they are considered to be without unemployment compensation income.

termining whether it adequately assured delivery of benefits "when due." See 365 F.Supp., at 936. We do not undertake to identify the combination of factors that justify the *Torres* decision. Having once decided the case summarily, we decline to do so again. We only indicate that the District Court should not have felt precluded from undertaking a more precise analysis of the statutory issue than it felt empowered to do in this case.

It may be seen from this discussion that the question raised by appellants respecting the Social Security Act has not been definitively determined for all fact constellations by the U.S. Supreme Court.

The above limitations are equally applicable to the federal due process question. The majority opinion essentially avoids any analysis of that question, instead extrapolating from U.S. Supreme Court opinions what that Court's position is. In discussing the import of *Fusari v. Steinberg, supra,* the majority adopts the interpretive view of the Indiana Supreme Court that "[i]f the Supreme Court was of the opinion that a pretermination hearing was constitutionally required, they [sic] would not have remanded the *Steinberg* case for further consideration in light of revisions which did not even provide for such a hearing."

I believe this conclusion is unwarranted and should not be adopted by this Court as dispositive of so important an issue. In his opinion in *Steinberg,* Justice Powell repeatedly states that it would be both difficult and inappropriate for the Supreme Court to decide the case in light of the amendments that were made to Connecticut law while the case was on appeal. "In these circumstances, we think it inappropriate to decide the issues tendered by the parties. We therefore vacate the decision of the District Court and remand for reconsideration in light of the intervening changes in Connecticut law." *Fusari v. Steinberg,* 419 U.S. 379, 380, 95 S.Ct. 533, 535, 42 L.Ed.2d 521 (1975). "We are unable meaningfully to assess the issues in this appeal on the present record." *Id.* at

387, 95 S.Ct. at 538. "[W]e can only speculate how the new system might operate. And, assuming that the federal statutory requirements were satisfied, it would prove equally difficult to assess the question of procedural due process." *Id.* at 388–89, 95 S.Ct. at 539–40.

From this language it should be clear that the Supreme Court's disposition in *Steinberg* does not decide the due process issue. Rather, that disposition only demonstrates the operation of the "principle of prudent restraint" explained by Justice Harlan in *Sanks v. Georgia,* 401 U.S. 144, 151, 91 S.Ct. 593, 597, 27 L.Ed.2d 741 (1971).

[I]t has always been a matter of fundamental principle with this Court, a principle dictated by our very institutional nature and constitutional obligations, that we exercise our powers of judicial review only as a matter of necessity. As said in *United States v. Petrillo,* 332 U.S. 1, 5 [67 S.Ct. 1538, 1540, 91 L.Ed. 1877] (1947), "We have consistently refrained from passing on the constitutionality of a statute until a case involving it has reached a stage where the decision of a precise constitutional issue is a necessity."

Had the revised Connecticut unemployment compensation procedures properly come before the Supreme Court on an appeal from the district court's decision of the remanded case, the Supreme Court might very well have decided that only a pretermination hearing would have satisfied due process requirements. Of course, we cannot know this; we can only speculate, since there is no analysis of that issue in the opinion. The point is that any position ascribed to the Supreme Court on the basis of this case is mere speculation. Speculation is no ground upon which to dispose of appellants' important constitutional claims.

## II

In view of the tenuous and unclear state of the federal law on both the statutory and federal due process claims, I do not believe that we should even treat the feder-

al issues until we have first determined what protections are afforded by Utah's Constitution. All five appellants contend that the Department of Employment Security's practice of terminating their unemployment benefits without a prior hearing denied them due process of law. Such a contention is not limited to the protections afforded by the due process clause of the United States Constitution. It also necessarily includes the protections afforded by the due process clause of the constitution of our own state.[2]

Article I, section 7 of the Utah Constitution states that "[n]o person shall be deprived of life, liberty or property, without due process of law." As we noted in *Untermyer v. State Tax Commission*, 102 Utah 214, 222–23, 129 P.2d 881, 885 (1942), this due process clause is substantially similar to that of the Fifth and Fourteenth amendments to the federal Constitution. In *Untermyer* we stated that "[d]ecisions of the Supreme Court of the United States on the due process clauses of the Federal Constitution are 'highly persuasive' as to the application of that clause of our state constitution." *Id.* Yet decisions of the Supreme Court are not dispositive of our interpretation of our own state constitution. This Court retains the power to independently interpret the due process clause of the Utah Constitution.

Such an independent analysis is required by this case. The United States Supreme Court has not spoken with a clear voice on this question. To follow the Supreme Court in this matter would require an interpretation of the "precise precedential significance of a series of rather bewildering summary dispositions of factually related suits by the Supreme Court." *Steinberg v. Fusari*, 364 F.Supp. 922, 924 (D.Conn.1973) (footnote omitted). The Supreme Court's remand of *Steinberg*, as I have indicated, provides no finality of interpretation.

In its analysis, this Court should treat the state constitutional issue before considering the federal question for at least three reasons. First, this approach would permit us to avoid treating the federal question at all if we are able to dispose of this case in favor of appellants on solely state constitutional grounds. *See American Federation of Labor v. California Employment Development Department*, 88 Cal.App.3d 811, 821, 152 Cal.Rptr. 193, 199 (1979). This is an especially prudent course in a case such as this where there is no clear interpretation of the federal issues by the Supreme Court.

Second, we should treat the state constitutional ground first because such a practice will result in a more principled and directed analysis of the facts contained in the case before us. As the majority opinion amply demonstrates, the analysis of the appellants' due process claims has been reduced to an attempt to divine what the Supreme Court "must have meant" by its various procedural dispositions. Very little attention has been paid to deciding whether the specific facts of the appellants' situations denied these individuals due process of law. The majority does not state, and I cannot find, any prior decisions of this Court that determine that the appellants' state right to due process is satisfied by a post-termination hearing for the termination of unemployment benefits. The issue is thus one of first impression in this jurisdiction and requires analysis.

Finally, treating the state constitutional grounds first would further the development of a distinguishable body of state constitutional law. The due process clause of the Utah Constitution should not serve merely as a reminder to search the volumes of the United States reports. It provides the people of this state with protections that may be greater in some instances than

2. While the appellants do not rely specifically on art. I, § 7 of the Utah Constitution, we may legitimately read their general due process challenge as broad enough to encompass it particularly since the status of the federal interpretation of the federal due process clause is ambigu-

ous and uncertain. Although we may of course interpret federal law on our own where the U.S. Supreme Court has not ruled, it is more logical and appropriate for us to look first to Utah's constitutional guarantees.

those afforded by the federal Constitution. By treating the state constitutional issue first, this Court may add to and develop a more readily distinguishable body of law interpreting the potentially separate due process rights that the people of Utah possess in addition to those enjoyed under the federal Constitution.

### A.

A common theme of this Court's due process cases is that due process "hears before it condemns, proceeds upon inquiry, and renders judgment only after trial." *Riggins, et al. v. District Court of Salt Lake City, et al.*, 89 Utah 183, 217, 51 P.2d 645, 660 (1935); *Christiansen v. Harris*, 109 Utah 1, 7, 163 P.2d 314, 316 (1945) (Wade, McDonough and Wolfe, J.J., concurring in the result). In *Christiansen*, this Court stated that due process did not necessarily require judicial action and that its requirements could be met, in proper cases, by executive or administrative action.

> But all these methods and means provided for the protection and enforcement of human rights have the same basic requirements—that no party can be affected by such action, until his legal rights have been the subject of an inquiry by a person or body authorized by law to determine such rights, of which inquiry the party has due notice, and at which he had an opportunity to be heard and to give evidence as to his rights or defenses.

*Id.* at 7, 163 P.2d at 317.

This Court has never followed a hard and fast rule that a hearing must always be provided before one may be deprived of any property interest of whatever magnitude. But in those cases where it has considered and approved a post-termination proceeding, this Court has demonstrated a consistent concern for the degree of injury that might result from a procedure allowing for only a subsequent hearing.

In *Thatcher v. Industrial Commission*, 115 Utah 568, 207 P.2d 178 (1949) (Pratt, C.J., dissenting), this Court considered a claim that the Industrial Commission denied appellant attorneys due process of law by ignoring their request for a hearing to determine what would be a reasonable fee for services performed. This Court concluded:

> Many times when the work done is not great and the compensation to be allowed is comparatively small, the commission may fix the fee without first granting a hearing .... Economy of time and effort to all concerned in those cases makes it practical for the commission to fix a fee from its experience in compensation cases without hearing as to the value of the services performed. But if the attorneys or the applicant ask [sic] for a hearing on the matter ... before the fee is fixed ... the same should be granted in order to satisfy the requirements of due process.

*Id.* at 578, 207 P.2d at 183.

In *Rupp v. Grantsville City*, Utah, 610 P.2d 338 (1980), the appellants were residents of Grantsville who refused to pay a $300 mandatory connection fee to the municipal sewer system. Pursuant to a city ordinance, water service to the appellants was cut off until they paid their fees. Appellants argued that the termination of their water service because of their failure to pay the mandatory connection fee was an unconstitutional deprivation of property without due process of law. This Court stated that "the demands of due process rest on the concept of basic fairness of procedure and demand a procedure appropriate to the case and just to the parties involved." *Id.* at 341 (footnote omitted). This Court held a post-termination hearing to be sufficient in this situation on two grounds. First, there was no question of fact requiring resolution at a hearing prior to termination of the water service. This Court was not faced with "a situation where a bona fide dispute exists concerning the *amount due* or the liability of the plaintiff for payment." *Id.* n. 9 (citation omitted) (emphasis added). The only question was the legality of the ordinance. *Id.* at 341. Second, a statutory procedure for paying under protest existed, and the municipality accepted various payment

schemes in relation to the mandatory connection fee, thereby "alleviating any economic hardship incident to the initial payment." *Id.* at 342 n. 11.

Most recently, this Court considered the case of an employer who appealed the Industrial Commission Board of Review's decision that increased its unemployment compensation contribution rate for failure to file a timely quarterly report and payment. The employer contended that it was denied due process of law when its contribution rate was raised without a prior hearing. It was noted that because the increased contribution rate was still being contested, the employer had not yet paid the Commission any of the increased rate. This Court held that the imposition of the increased contribution rate by the Commission did not violate the employer's due process rights because it had an adequate subsequent opportunity to be heard *"and because it has not been injured by the assessment of the increased rate prior to an evidentiary hearing." Vali Convalescent & Care Institution v. Industrial Commission,* Utah, 649 P.2d 33, 36 (1982) (emphasis added).

The past opinions of this Court show the magnitude of injury to the private interest to be of paramount, though not exclusive, importance. In interpreting our state's due process clause, we must review the whole procedure to determine whether it is "appropriate to the case and just to the parties involved," *Rupp, supra,* at 341, but we should give special weight to the magnitude of deprivation that results from the questioned procedure.

B.

The public policy of this state, as declared by our Legislature, speaks clearly of the devastating impact of unemployment:

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Unemployment ... requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this great hazard of our economic life.

U.C.A., 1953, § 35–4–2.

The strong language of this statute cannot be ignored. I cannot see how such a "serious menace" is averted or the "crushing force" of its burden alleviated by the interruption of unemployment benefits to those who are eligible to receive them. The precarious financial situation of most people who are eligible for such benefits almost insures that the purposes of the Utah Employment Security Act will not be met upon the interruption of payments. The record, for example, shows that upon interruption of her benefits appellant Payotelis became unable to pay her utility bill, had difficulty making her house payments, had sold several household appliances to raise cash and had been forced to borrow money from her daughter. Moreover, a vicious cycle is perpetuated in these cases as claimants whose benefits are terminated because they have not made the required number of in-person inquiries subsequently find it yet more difficult to pay for their transportation to meet the in-person requirement in the future. I think the facts show that the same legislative concern that dictates the provision of unemployment benefits dictates also their uninterrupted provision to those eligible to receive them. *Cf. Goldberg v. Kelly,* 397 U.S. 254, 265, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970).

Uninterrupted benefits to eligible recipients can only be guaranteed by pretermination hearings because of the potential complexity of the factual issues involved. *Royer v. State Department of Employment Security,* 118 N.H. 673, 394 A.2d 828, 832 (1978). Obviously, the situation we are faced with today is unlike the one we faced in *Rupp,* where we held that no pretermination hearing was required, partly because no question of fact was in issue. *Rupp, supra,* at 341. Rather, the interview procedure by which the Department of Employment Security made its initial decision to terminate appellants' benefits does not af-

ford a sufficient opportunity for the appellants to explain the adequacy of their job search.

Appellants were denied benefits as a result of their attending an interview and submitting a list of their contacts. This procedure is defective because the decision appears to be based on the written list appellants submit, which procedure is without adequate safeguards against misunderstandings, omissions or inaccurate submissions.

Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance.

*Goldberg, supra,* 397 U.S. at 269, 90 S.Ct. at 1021. *Accord Mathews v. Eldridge,* 424 U.S. 319, 344–45, 96 S.Ct. 893, 907–08, 47 L.Ed.2d 18 (1976). This problem is illustrated by the record here. The form provided by the Department did not contain enough spaces for appellant Payotelis to list all of her contacts, and the supplemental list she attached to the form was lost by the Department. Appellant Gray, misconstruing the purpose of the procedure, listed only what he thought were his "best" contacts.

My belief in the inadequacy of the submission of written lists is closely related to the additional defect created by the Department's failure to give the appellants an opportunity to be represented by counsel before the decision to terminate their benefits was made.

Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient.

*Goldberg, supra,* 397 U.S. at 270–71, 90 S.Ct. at 1021–22. The presence of counsel would not only have cleared up the confusion several of the appellants experienced at their interviews, but it would also enable the appellants to be advised before they signed the "statements" that were prepared for them by the Department.

Additionally, I question whether the appellants ever received adequate notice that their benefits could be terminated as a result of the interviews. Such notice appears to have been provided them only at the *end* of the interviews, after all of the substantive part of the exchange was completed.

I would follow the guidelines set forth in the opinion of the Supreme Court in *Goldberg, supra,* at 266–71, 90 S.Ct. at 1019–22, regarding the outlines of an adequate pretermination hearing. The recipient should have "timely and adequate notice detailing the reasons for a proposed termination." *Id.* at 267–68, 90 S.Ct. at 1020–21. The recipient should be allowed to state his position orally before an impartial decisionmaker. The recipient should be given an opportunity to confront and cross-examine any witnesses relied on by the Department. Because of the informal nature of such a hearing and the accompanying relaxed rules of evidence, documentary evidence alone would in some instances be sufficient to support the termination of a recipient's payments. The hearing would then afford the recipient an opportunity to explain the untruth or inaccuracy of such evidence. The recipient should be allowed to retain counsel, though counsel need not be provided for him. Finally, the "decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing." *Id.* at 271, 90 S.Ct. at 1022. Compliance with this last standard would require that the decisionmaker report why he reached his conclusion and what evidence he relied on, though this report need not amount to formal findings of fact and conclusions of law.

The hearings that were granted these appellants *after* the termination of their benefits appear to adequately meet the minimum standards of rudimentary due process I believe are required in a pretermination hearing. The record that was kept of these hearings, in order to facilitate judicial review, would not necessarily be required in the pretermination stage. Nevertheless, because a full hearing with a record would be required at some point in a

recipient's appeal, the Department might find it most efficient to simply delay termination of benefits until after the hearing is held.

Any increase in administrative costs that might result from holding hearings before terminating benefits is outweighed by the eligible claimant's need to receive prompt and consistent payment of benefits. The loss to the Department of sums paid to ineligible recipients can be greatly reduced by a prompt system of hearings. Furthermore, the loss may be greatly tempered in many instances through recovery of overpayments by set-off against future benefits. *See Royer, supra,* 394 A.2d at 832. In any case, "the potential abuse by some of procedures designed to protect all ... cannot be the basis for deciding whether the procedures are required by due process." *American Federation, supra,* 88 Cal.App.3d at 821, 152 Cal.Rptr. at 199.

I would hold that the due process clause of the Utah Constitution requires that a hearing be afforded a claimant before his unemployment benefits can be terminated. I would thus have this Court join the courts of California and New Hampshire, which have held the same based on their state constitutions. *American Federation, supra; Royer, supra.* Because I would decide this case under the Utah Constitution, I would not reach the question of whether the due process clause of the United States Constitution has been violated.

### III

I also dissent from the majority's conclusion in Part I that the Department subjectively applied the in-person contact requirement in the case of Agnes Payotelis.

Appellant Agnes Payotelis is a forty-nine-year-old woman who has most recently worked as a pest control exterminator, a technical position licensed by the Department of Agriculture. She worked at her last job for three years before being laid off on July 31, 1982. Prior to her last job, she had worked at another exterminator company. Before then she had also had experience as a seamstress. Until she was laid off, Ms. Payotelis had not drawn unemployment benefits for twenty years.

At the appellant's hearing before the appeals referee, her counsel cogently attacked the two-to-three new in-person contact rule as applied to Ms. Payotelis' situation. Testimony showed that within the Salt Lake metropolitan area there are only about 12 exterminator companies. If one includes those areas more than a reasonable distance from Ms. Payotelis' residence, the number is not greatly increased. Ms. Payotelis was therefore limited in the number of employers she could contact who would qualify as employers who would hire someone in her "occupational field." Moreover, a diligent job search would rapidly exhaust the number of qualified "new" contacts Ms. Payotelis would have to make to meet the requirement of the rule.

Ms. Payotelis did contact every exterminator in the area. Because of her knowledge of the business and because of her own experience in being laid off, she knew that most would probably not be hiring. Nevertheless, she contacted every company. Instead of wasting gasoline by inquiring in person at every company, she called first and personally visited only those that allowed her to fill out an application. She furthermore kept in contact with all of the companies to determine whether any of their hiring situations had changed.

Ms. Payotelis' strategy was recommended to her not only by its eminent good sense, but also by her precarious financial situation. Since being laid off, Ms. Payotelis' only source of income has been her unemployment compensation. She must make a $125 monthly payment on her mobile home. At the time of her hearing, she had been unable to pay her gas utility bill, had sold several household appliances to raise cash and had been forced to borrow gas money from her daughter so as to be able to attend her hearing. It seems entirely reasonable that one in such an extreme position would not senselessly waste any portion of her meager resources on a series of futile personal visits.

The majority finds "no evidence whatsoever of a rigid or inflexible application of the in-person-contact requirement." To the contrary, the rigid syllogistic reasoning of the appeals referee is evident from the face of his written opinion. The referee only notes that Ms. Payotelis had been aware of the requirement to make at least two or three in-person contacts to prospective employers each week and that she had failed to meet this requirement between October 3 and October 23. He then summarily concludes that she had not met the eligibility requirements of the Department of Employment Security for three weeks in October. No analysis of Ms. Payotelis' particular circumstances and no response to her attorney's arguments are contained in the referee's written decision. The language of the referee's opinion quoted by the majority refers only to the period after November 28 and is not applicable to the earlier period.

I would overrule the Department's decision denying benefits from October 3, 1982, through October 23, 1982, and eliminate the resulting assessment of an overpayment. There may be some special merit to an in-person contact as opposed to a phone call, and I do not question the expertise of the Department of Employment Security in this respect. However, it does appear from the facts of this case that Ms. Payotelis, based on her experience in the business, intelligently and prudently conserved her resources by calling ahead to discover whether a personal visit would prove worthwhile. I can see little sense in refusing to allow the use of the telephone in those cases where it is appropriate and instead requiring people of limited means to knowingly waste their last dollars on certainly futile personal contacts. If the Department has some reason for requiring this, it should state it in the context of these facts. The opinion of the appeals referee is a mechanical application of a requirement that in this case has been shown to be irrelevant and futile. I would reverse.