## Richmond

DENNIS KLIMKO V. VIRGINIA EMPLOYMENT COMMISSION.

March 5, 1976.

Record No. 750018.

Present, All the Justices.

*George Wm. Warren, IV* (*Hall, Hall & Warren*, on brief), for plaintiff in error.

*W. Thomas Hudson, Assistant Attorney General* (*Andrew P. Miller, Attorney General*, on brief), for defendant in error.

POFF, J., delivered the opinion of the court.

Appealing a decision of the Virginia Employment Commission (VEC) upheld by the trial court, Dennis Klimko (claimant) contends first, that "the expectation of continued compensation benefits by an unemployed worker amounts to a vested property interest entitled to" procedural due process protection of the Fourteenth Amendment and second, that "the procedural scheme utilized . . . for terminating appellant's on-going unemployment compensation benefits" denied him such protection.

On October 31, 1971, claimant, a resident of Arlington County, lost his job as an "office equipment service technician" for Singer-Friden Division. Later, he moved his residence to Youngstown, Ohio, and filed a claim for unemployment compensation benefits with the local office of the Ohio Bureau of Unemployment Compensation (the Ohio bureau). The claim was approved effective October 31, 1971, and VEC commenced payments at the rate of $59 per week.[1]

[1] The unemployment compensation system is a joint federal-state venture involving certain interstate operations. The Commonwealth of Virginia imposes a tax on employers. Code §§ 60.1-70, *et seq.* The revenues are deposited in the state Unemployment Compensation Fund and later transferred to the federal Unemployment Trust Fund established under the Social Security Act. *See* Code § 60.1-107 (Repl. Vol. 1973); 42 U.S.C. § 1104. The federal government also levies a tax on employers, 26 U.S.C. §§ 3301, *et seq.*, but employers are entitled to a credit for taxes paid to a state unemployment fund certified under 26 U.S.C. § 3304. *See* 26 U.S.C. § 3302. To obtain such a certification, however, a state may not reduce or deny compensation to an employee "solely because he files a claim in another State . . . or because he resides in another State . . . at the time he files a claim. . . ." 26 U.S.C. § 3304(a) (9) (A).

If the secretary of Labor certifies to the Secretary of the Treasury that a state's unemployment compensation laws contain certain required provisions, *see* 42 U.S.C. § 503, the federal government will pay that state the costs of administering its unemployment compensation laws. 42 U.S.C. §§ 501, *et seq.* Under Code § 60.1-44 (Repl. Vol. 1973), VEC is directed to "take such action, through the adoption of appropriate rules, regulations, administrative methods and standards, as may be necessary to secure to this State and its citizens all advantages available under the provisions of the Social Security Act that relate to unemployment compensation. . . ."

To enable employers to take advantage of the federal tax credit, Code § 60.1-45 (Repl. Vol. 1973) authorizes VEC to enter into certain reciprocal agreements with other states. All states participate in what is called the "Interstate Benefit Plan",

On February 9, 1972, a Youngstown employer to whom claimant was referred by the Ohio bureau offered claimant a job as an "office machine serviceman". Claimant refused the offer. The Ohio bureau notified claimant to attend a fact-finding interview. Claimant appeared on February 17, 1972, and made an oral statement explaining his reasons. The fact-finding examiner reduced his statement to writing, and claimant signed it. Claimant said that, in his former position, he was paid approximately $600 per month, the company paid the premiums on his medical insurance, and he was given full-time use of a company car. In the new job, claimant's salary was to be $500 per month, his insurance premiums were not to be paid, and while he was to have the use of his employer's truck, he was to be required to use his own car part of the time. Claimant stated that "I just could not accept this offer of work because of these wages." The employer advised the examiner by telephone that "pay to start was $500 per month, and more pay if employee was worth it after hire, because claimant did have experience". The "local ES supervisor" stated that the rate of pay offered was the prevailing rate in the area.

The Ohio bureau summarized this information in a "Fact Finding Report" and forwarded the report and claimant's statement to VEC. Based upon these data, a VEC deputy made a finding that the job offered was "suitable employment" and was refused without good cause. The deputy rendered a determination dated February 28, 1972, that, under Code § 60.1-58(c) (Repl. Vol. 1973), "this claimant is subject to a disqualification". Benefits were terminated effective February 13, 1972, the week in which the fact-finding interview was conducted.

Claimant filed a "Notice of Interstate Appeal" on March 2, 1972, and the VEC requested the Ohio bureau to schedule another hearing. After formal notice to claimant, the hearing was held on March 31, 1972. At that hearing, claimant testified that, in addition to reasons

and for that purpose, each has adopted administrative regulations, patterned after the Draft Regulations for Interstate Benefits. *See* 1B CCH, UNEMPL. INS. RPTR., ¶ 2050 (1975) [hereinafter "CCH"]. Virginia and Ohio have adopted the draft regulations. *See* Rules and Regulations Affecting Unemployment Compensation (issued by VEC) and Regulations of the Bureau of Unemployment Compensation (issued by the Ohio bureau). IB CCH ¶ 5221. Under these regulations, a claimant may collect benefits from the state in which he is eligible, the "liable" state, even though he resides in the other state, the "agent" state. Procedures on interstate claims and appeals are prescribed by reciprocal regulations. *See infra* at Part II B. The agent state has no authority to make decisions concerning the claimant's rights; it simply conducts a fact-finding interview and forwards its information to the liable state which determines the claimant's rights and pays benefits according to its laws.

previously assigned, one of the reasons for his refusal was that he felt he was not properly trained in the skills the new job required. The transcript of this hearing was transmitted to a VEC appeals examiner who rendered a decision on April 11, 1972, affirming the deputy's determination.

From this decision, claimant filed a second interstate appeal on April 20, 1972. VEC scheduled a hearing in Richmond for May 15, 1972, and notice was sent to claimant. Claimant did not appear at the hearing, and by decision dated June 16, 1972, VEC affirmed the decision of the appeals examiner and terminated benefits effective February 6, 1972, the week in which claimant refused "to accept suitable work . . . offered him". Code § 60.1-58(c). On July 16, 1975, claimant petitioned the trial court for review of the Commission's decision. The trial court ruled that VEC's "actions . . . comport with requirements of procedural due process" and struck claimant's petition for review from the docket.

■ Our constitutional due process guarantees spring from deep and ancient roots. In chapter 29 of Magna Carta (issue of 1224-25), the King promised that "[n]o free man shall be taken or imprisoned, or be deprived of his freehold, or his liberties . . . unless by the lawful judgment of his Peers, or by the law of the land." 1 *Statutes at Large of England and of Great Britain* 8 (Thomas Tomlins ed. 1810). The first recordation of the phrase "due process of law" is found in chapter 3 of 28 Edw. III (1354): "no man . . . shall be put out of Land or Tenement . . . nor put to Death, without being brought in Answer by due Process of Law." *Id.* at 358. Coke construed the phrases "by law of the land" and "due process of law" as equivalent terms meaning "by indictment or presentment of good and lawfull men . . . or by writ originall of the common law." 1 Coke, *The Institutes of the Laws of England* 50 (1797). The "writ originall" was the process by which civil actions were instituted in the King's courts. Thus, conceptually and functionally, "due process" was originally purely procedural. After ratification of the Fifth Amendment, the due process clause was applied as well as a limitation upon the substantive content of statutory enactments. *See, e.g., Coppage* v. *Kansas*, 236 U.S. 1 (1915); *Lochner* v. *New York*, 198 U.S. 45 (1905); *Scott* v. *Sandford*, 60 U.S. 393 (1856). *Compare Williamson* v. *Lee Optical*, 348 U.S. 483 (1955).

The due process clauses of the Fifth and Fourteenth Amendments apply both procedural and substantive constraints upon deprivations of "liberty" and "property". Whether a particular liberty interest

or property interest is a protected interest no longer depends upon whether it is a "right" or a "privilege", for the "wooden distinction" between the two has been "fully and finally rejected". *Board of Regents* v. *Roth,* 408 U.S. 564, 571 (1972).

When procedural due process respecting deprivation of a property interest is challenged, the Supreme Court pursues a two-step inquiry. *See, e.g., Goss* v. *Lopez,* 419 U.S. 565 (1975); *Board of Regents* v. *Roth, supra; Perry* v. *Sindermann,* 408 U.S. 593 (1972); *Fuentes* v. *Shevin,* 407 U.S. 67 (1972). The first inquiry is whether the interest is a property interest protected by procedural due process guarantees; if so, the second is whether the procedures prescribed or applied are sufficient to satisfy the due process "fairness" standard.[2]

Pursuing the two-step inquiry, we consider first whether the expectation of continued unemployment compensation benefits is a protected property interest.

## I.

In a constitutional context, the connotative dimensions of the word "property" are greater than the corporeal definition used by the layman. "The Court has . . . made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." (Footnote omitted). *Board of Regents* v. *Roth,* 408 U.S. at 571-72. Procedural due process has been extended to attachments by creditors, *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U.S. 601 (1975); to wage garnishments, *Sniadach* v. *Family Finance Corp.,* 395 U.S. 337 (1969); to a driver's license suspension, *Bell* v. *Burson,* 402 U.S. 535 (1971); to a tax exemption denial, *Speiser* v. *Randall,* 357 U.S. 513 (1958); to the right to government employment, *Connell* v. *Higginbotham,* 403 U.S. 207 (1971); *Slochower* v. *Board of Higher Education,* 350 U.S. 551 (1956); *Wieman* v. *Updegraff,* 344 U.S. 183 (1952); *but compare Arnett* v. *Kennedy,* 416 U.S. 134 (1974); to the right to an uninterrupted education, *Goss* v. *Lopez, supra;* and to the right to welfare benefits, *Goldberg* v. *Kelly,* 397 U.S. 254 (1970).

Yet, the Supreme Court has never held explicitly that unemployment compensation benefits enjoy procedural due process protection.[3]

---

[2] Here, claimant does not challenge the facial constitutionality of the laws and regulations.

[3] In *California Dep't of Human Resources Development* v. *Java,* 402 U.S. 121 (1971), the Court reviewed a three-judge district court decision which held that unemployment compensation benefits are a protected property interest and that the termination procedures employed violated § 303(a)(1) of the Social Security Act,

Such a holding seems implicit, however, in its language in *Fusari* v. *Steinberg*, 419 U.S. 379, *reh. denied*, 420 U.S. 955 (1975). There, a three-judge district court held that Connecticut's procedures for determining continuing eligibility for unemployment compensation benefits violated the due process clause. Following that decision, the state revised its procedures. The Supreme Court remanded for reconsideration in light of the changes. Noting that "we can only speculate how the new system might operate" and that "it would be . . . difficult to assess the question of procedural due process", Mr. Justice Powell, speaking for an unanimous court, said:

> "Identification of the precise dictates of due process requires consideration of both the governmental function involved and the private interests affected by official action." (Citations omitted). 419 U.S. at 389.

While sufficiency of the procedures was the only due process question before the Court, this language appears to be a tacit acknowledgment that the expectation of continued unemployment compensation benefits may constitute a property interest within the protection of the procedural due process guarantees of the Constitution.[4]

Evaluating that question, courts "must look not to the 'weight' but to the *nature* of the interest at stake." *Board of Regents* v. *Roth*, 408 U.S. at 570-71. And they must be guided by the fact that "[t]he Court's view has been that as long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account

42 U.S.C. § 503(a)(1) (1970), which provides that state procedures be "reasonably calculated to insure full payment of unemployment compensation when due". The judgment was reversed and the case remanded on the statutory question; the Court did not reach the constitutional issue.

Nor was that issue decided in *Sherbert* v. *Verner*, 374 U.S. 398 (1963), on which claimant relies. There, the Court held that a state could not, by application of its unemployment compensation laws, infringe a First Amendment right to free exercise of religion.

[4] *See also Torres* v. *New York State Department of Labor*, 321 F. Supp. 432 (S.D.N.Y. 1971), *vacated and remanded*, 402 U.S. 968 (1971), *prior decision adhered to on remand*, 333 F. Supp. 341 (S.D.N.Y. 1971), *aff'd*, 405 U.S. 949 (1972), *reh. denied*, 410 U.S. 971 (1973). There, the Supreme Court affirmed without opinion the decision of a three-judge district court which upheld challenges to a state's unemployment compensation laws and procedures on both due process and statutory grounds.

However, a summary affirmance of a lower court's judgment does not necessarily embrace "the reasoning by which it was reached." *Fusari* v. *Steinberg*, 419 U.S. at 391-92, (Burger, C.J., concurring).

must be taken of the Due Process Clause." *Goss* v. *Lopez*, 419 U.S. at 576.

Money paid a qualified worker during the term of his unemployment is not a gratuity or a form of charity; rather, it is "compensation", an earned emolument of his labor. If he satisfies the work requirements, his right to benefits accrues at the time he becomes involuntarily unemployed without cause, and the amount of his entitlement is fixed by the wages he has earned. "Unemployment compensation differs from relief in that payments are made as a matter of right, not on a needs basis. . . ." S. REP. No. 628, 74th Cong., 1st Sess. 11 (1935).

Although welfare payments are not compensation for work performed and are made solely on a "needs basis", a majority of the Supreme Court in *Goldberg* v. *Kelly*, *supra*, held that such payments constitute a property interest entitled to procedural due process protection. Subsequent to *Goldberg*, the unanimous court in *Fusari* implicitly acknowledged that unemployment compensation benefits may enjoy the same protection. In an opinion handed down less than two weeks ago the Supreme Court noted that it "has been implicit in our prior decisions . . . that the interest of an individual in continued receipt of these [social security disability] benefits is a statutorily created 'property' interest protected by the Fifth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). However, because the Court has never explicitly decided this question, we shall assume, without deciding, that the expectation of continued unemployment compensation benefits is a protected property interest.

## II.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey* v. *Brewer*, 408 U.S. 471, 481 (1972).

Claimant divides his contention that "the procedural scheme utilized" denied him due process into two parts. First, he says that he was entitled to, but was denied, a hearing of constitutional dimensions *preceding* the February 28 decision terminating his benefits. Second, he asserts that the post-termination hearing of March 31 was constitutionally defective because he was denied certain rights incident to an adversary hearing.

## A.

Addressing the question "whether a hearing of some sort must be held *before* any 'taking' of the employee's property interest in his

job occurs, even if a full hearing is available before that taking becomes final", Mr. Justice White, concurring in part and dissenting in part in *Arnett* v. *Kennedy, supra,* 416 U.S. at 187, said:

"In passing upon claims to a hearing before preliminary but nonfinal deprivations, the usual rule of this Court has been that a full hearing at some time suffices. 'We have repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective.' 'It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.' " (Citations omitted).

In *Mitchell* v. *W. T. Grant Co.,* 416 U.S. 600 (1974), a case involving sequestration of chattels, no prior hearing was held and the debtor argued on appeal that a subsequent evidentiary hearing did not satisfy due process guarantees. Speaking of a long list of cases cited by the debtor, the Court said:

"[T]hey merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided. The usual rule has been '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.' " (Citations omitted). 416 U.S. at 611.

In the recent case of *North Georgia Finishing, Inc.* v. *Di-Chem, Inc., supra,* a debtor challenged the due process sufficiency of an *ex parte* attachment statute. The Supreme Court compared the *ex parte* replevin statute invalidated in *Fuentes* v. *Shevin, supra,* with the *ex parte* sequestration statute upheld in *Mitchell* v. *W. T. Grant Co., supra.* The court noted that, in *Fuentes,* the statute permitted the seller to repossess goods without hearing under a writ issued by the clerk of court, while in *Mitchell,* the statute required an affidavit justifying the writ, issuance of the writ by a judge, an "immediate hearing after seizure", and dissolution of the writ absent proof justifying the writ. Based upon this comparison, the *North Georgia* court ruled that "the official seizures had been carried out without notice and without opportunity for a hearing or *other safeguard against mistaken reposses-*

*sion.*" (Emphasis added). 419 U.S. at 606. Applying this *ratio deciden-di* to the context of unemployment compensation benefits, it would seem that there is no constitutional requirement of *any* pretermination hearing where there are safeguards against mistaken termination of benefits.

It is true, as claimant asserts, that the Supreme Court has held in a limited number of cases that a pretermination hearing must be provided, even where a post-termination hearing is provided. Speaking of these cases, Mr. Justice White said in *Arnett* v. *Kennedy*, 416 U.S. at 188:

> "In assessing whether a prior hearing is required, the Court has looked to how the legitimate interests asserted by the party asserting the need for a hearing, and the party opposing it, would be furthered or hindered."

This "balancing test", first announced in *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U.S. 886, 895 (1961), was applied in *Goldberg* v. *Kelly, supra.* The *Goldberg* Court held that, with respect to entitlement to welfare benefits, "only a pre-termination evidentiary hearing provides . . . procedural due process" and explained:

> "Thus, the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, *or virtually anyone else whose governmental entitlements are ended* [emphasis added]—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* [emphasis in text] recipient of the very means by which to live while he waits." 397 U.S. at 264.

While the Court concluded that this "brutal need" outweighed "countervailing governmental interests in conserving fiscal and administrative resources", it recognized that not every property interest is of such a nature.

Concerning need, the interest of an unemployed worker whose unemployment compensation benefits are terminated is similar to that of a government worker whose job is terminated. In *Arnett* v. *Kennedy*, 416 U.S. at 169, Mr. Justice Powell, concurring, said:

> "Since appellee would be reinstated and awarded backpay if he prevails on the merits of his claim, appellee's actual injury would

consist of a temporary interruption of his income during the interim. To be sure, even a temporary interruption of income could constitute a serious loss in many instances. But the possible deprivation is considerably less severe than that involved in *Goldberg*, for example, where termination of welfare benefits to the recipient would have occurred in the face of 'brutal need.' . . . By contrast, a public employee may well have independent resources to overcome any temporary hardship, and he may be able to secure a job in the private sector. Alternatively, he will be eligible for welfare benefits."

*See also Mathews* v. *Eldridge, supra*, at 4231.

Applying the "balancing test", the legitimate interest of an unemployed worker in receiving an uninterrupted flow of benefits during his period of entitlement must be weighed against all legitimate interests of the government. Conservation of the public fisc is such an interest. The actuarial integrity of the Unemployment Trust Fund is important to employers whose tax payments finance it; to the extent benefits are erroneously paid and not recovered,[5] taxes may be increased; to the extent taxes are increased, consumer prices may be increased. The ongoing solvency of the fund is also important to every covered employee presently or potentially entitled to benefits. For the sake of productive commerce and an efficient economy, interests important to the public at large, the government has an interest in insuring that unemployed workers return to employment as soon as reasonably practicable.

Weighing the countervailing interests, we believe that the balance lies in favor of the government and the public at large. In such case, involving only property rights, the precedents indicate that when a constitutionally sufficient post-termination hearing is provided, due process does not categorically mandate a pretermination hearing if there are safeguards against mistaken termination.

### B.

We now consider, first, whether the fact-finding interview and other pretermination procedures were an adequate "safeguard against mistaken" termination, and, second, whether the post-termination hearing and appellate procedures were constitutionally sufficient.

---

[5] The risk of non-recovery is heightened when, as here, the claimant resides outside the jurisdiction of the "liable" state.

■ Challenging the adequacy of the pretermination procedures, claimant relies again on *Goldberg* v. *Kelly, supra. Goldberg* held that the welfare recipient must be afforded "timely and adequate notice detailing the reasons for a proposed termination"; an opportunity to appear personally and "state his position orally"; "an opportunity to confront and cross-examine the witnesses"; the right to retained counsel; the right to "an impartial decision maker"; the right to a decision based "solely on the legal rules and evidence adduced at the hearing"; and the right to a statement of the reasons for the decision and its evidentiary underpinning. 397 U.S. at 266-71.

The form and features of the hearing, like the timing of the hearing, were premised upon "the crucial factor in this context", *i.e.*, the "brutal need" of the welfare recipient. Because, as we have said, the need of the claimant here is not so brutal and the countervailing public interests preponderate, we are of opinion that a *Goldberg*-type pretermination hearing is not a due process imperative.

The pertinent inquiry, then, is what procedures are required. "Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' " (Citations omitted). *Morrissey* v. *Brewer*, 408 U.S. at 481. Due process requires "no particular form of procedure; it protects substantial rights." *NLRB* v. *Mackay Co.*, 304 U.S. 333, 351 (1938). Due process requirements "are not technical, nor is any particular form of procedure necessary." *Inland Empire Council* v. *Millis*, 325 U.S. 697, 710 (1945). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U.S. at 895.

Claimant relies heavily upon *Goss* v. *Lopez, supra*. There, students were suspended without prior notice or hearing. The Court assumed "that the suspension will not be stayed pending a [post-suspension] hearing, and that the student meanwhile will irreparably lose his educational benefits",[6] 419 U.S. at 581-82, fn. 10, and ruled that certain pre-suspension procedures were constitutionally required. Specifically, the Court held that "due process requires . . . that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581.

---

[6] Here, the loss is not irreparable; if post-termination proceedings show that termination was erroneous, a claimant may, within the limits of his period of entitlement, be awarded benefits retroactive to the date of termination. *See* Code § 60.1-62.

Explicating its holding, the Court said:

"There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is. . . .

. . .

"We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident. Brief disciplinary suspensions are almost countless. To impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness. . . ." 419 U.S. at 582-83.

The Ohio bureau gave claimant notice of the fact-finding interview and advised him of the charge that he had unjustifiably refused an offer of suitable employment. Unlike the welfare recipient in *Goldberg*, claimant appeared in person and stated "his side of the story" orally. His oral statement, transcribed and signed, was considered by the VEC deputy, "an impartial decision maker", before the termination decision was rendered. We hold that the pretermination procedures were an "adequate safeguard" against mistaken termination and that while those procedures did not include all of the features prescribed in *Goldberg*, they fully satisfied the due process standards defined in *Goss*. Here, as in *Mathews*, "the prescribed procedures not only provide the claimant with an effective process for asserting his claim prior to any administrative action, but also assure a right to an evidentiary hearing, as well as to subsequent judicial review, before the denial of his claim becomes final." (Citation omitted). 44 U.S.L.W. at 4233.

■ We turn now to the question put by claimant "whether the [post-termination] hearing actually held can meet constitutional muster." He contends that he was denied due process, first, because "the fact finder and decision maker . . . [were not] the same person", and,

second, because he was not afforded "the historic right of confrontation and cross-examination of adverse witnesses." [7]

While "an impartial decison maker is essential", *Goldberg* v. *Kelly*, 397 U.S. at 271, *see also Morrissey* v. *Brewer*, 408 U.S. at 485-86, it is not essential to impartiality that the fact-finder and decision maker be the same person, and we do not read *Goldberg* or *Morrissey* to hold that such identity is essential to due process.

Considering claimant's second contention, we look to the relevant laws and regulations. Both the Virginia and Ohio regulations expressly require "reasonable cooperation . . . in connection with appealed interstate benefit claims." 1B CCH ¶ 5227 (Ohio); 10 CCH ¶ 5109 (Va.).

Chapter 1 of Ohio's "Rules of the Board of Review" provides that "[p]roceedings held within the State of Ohio on initial appeals and further appeals in cases involving interstate claims for benefits shall be governed by these Rules of Procedure". 1B CCH ¶ 5313. The rules as defined in Chapter 7 provide, *inter alia*, that notice shall be given "at least seven (7) calendar days prior to the date of any hearing . . . specifying the time and place of the proceedings, and setting forth, in brief, the issues to be heard and the proceedings to be held"; that testimony "shall be under oath or by affirmation"; that "the proceedings shall be recorded"; and that the "file of the Administrator . . . shall be made a part of the record". While "the proceedings shall be informal . . . each interested party and his representative shall have all rights of fair hearing, including the right of examination and cross-examination of witnesses, the right to present testimony and other evidence, the right to inspect and examine documents, files, reports and records received in evidence, the right to present testimony and other evidence in explanation and rebuttal, the right to subpoenas for witnesses and documentary evidence and the right to present argument." [8] 1B CCH ¶¶ 5315, 5317.

After the agent state has completed the fact-finding function and VEC has rendered its appellate decision on the merits, *see* Code § 60.1-64 (Repl. Vol. 1973), a dissatisfied claimant is authorized full judicial review under Code § 60.1-67 (Repl. Vol. 1973).

If claimant did not enjoy the right of confrontation and cross-ex-

---

[7] Claimant does not contend that he was denied any of the other rights incident to an evidentiary hearing or judicial determination.

[8] VEC Regulation X, entitled "Appeals", read in context with Regulation IX, entitled "Interstate Claimants", provides similar procedures when Virginia, as the agent state, conducts hearings on interstate appeals. 10 CCH ¶¶ 5109, 5110.

amination or any of the other rights available to him under the laws and regulations, it was not because they were denied him; it was, insofar as the record discloses, only because he did not pursue them.

We hold that the pretermination and post-termination procedures satisfied the due process mandate of the Fourteenth Amendment.

"In any judicial proceedings under this chapter, the findings of the Commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of such court shall be confined to questions of law." Code § 60.1-67. The trial court held that VEC's factual findings were "supported by the Record filed in the case". We agree, and the judgment is

*Affirmed.*

CARRICO, J., concurring.

I concur in the opinion of Mr. Justice Poff, but only to the extent that it *assumes* a property interest in the expectation of continued compensation benefits and then holds that due process requirements are satisfied by the pretermination and post-termination procedures applicable in this case. I do not wish my concurrence, however, to be construed as agreement with the proposition that there exists a property interest in the expectation of continued compensation benefits. Indeed, I strongly disagree with that proposition.

HARRISON, COCHRAN, and COMPTON, JJ., join in this concurring opinion.