## CIRCUIT COURT OF FAIRFAX COUNTY

C.R.G.

v.

Carol A. Brunty,
Commissioner of the
Department of Social Services

March 6, 1996

Case No. (Chancery) 140810

By Judge M. Langhorne Keith

On December 30, 1994, Carol A. Brunty, the Commissioner of the Department of Social Services ("DSS"), determined that five complaints of sexual abuse against C.G. were "Founded-Sexual Abuse-Level 1"[1] and determined that a sixth complaint should be disposed of with a finding of "Reason to Suspect-Sexual Abuse." G. appealed pursuant to Va. Code Ann. §§ 9-6.14:15 et seq. and § 63.1-248.6:1(B).

G. pleaded ten specific assignments of error in his petition for appeal. Collectively, these assignments can be summarized into two categories: (1) G. was denied due process of law and (2) there was not substantial

---

[1] Identifying information in the case of a Level I finding is maintained in the Child Abuse and Neglect Information System (CANIS) central registry for 18 years past the date of complaint. For Level 2 findings, identifying information is maintained in the file for seven years, while Level 3 findings require a maintenance period of three years. Virginia Department of Social Services Regulation VR 615-45-1 § 2.2 (1991). Identifying information in the case of a "reason to suspect" finding was maintained for one year. The reason to suspect finding category was struck down by the Court of Appeals in *Jackson v. Marshall*, 19 Va. App. 628, 454 S.E.2d 23 (1995), and in G.'s case, the reason to suspect finding was vacated by DSS.

evidence in the record to support the DSS findings.[2] After reviewing the record, the briefs filed by the parties, and considering the arguments of counsel heard on January 3, 1996, the Court reverses the DSS findings for the reasons set forth below.

## I. *Background*

In April of 1993, C.G. had been a Fairfax County schoolteacher for some twenty-one years. G.'s career as a teacher imploded that month when Ms. Erin O'Rourke, a former student who had recently been released from a psychiatric hospital in Missouri, allegedly recovered repressed memories that G. had sexually assaulted her in 1982. Up until April, 1993, G. had been a popular and successful physical education teacher in the Fairfax County school system. In 1989 he had been specially selected to teach physical education at Virginia Run Elementary School, a new school in the Centreville area of Fairfax County. He was active in the Physical Education Association and was considered a leader and a model for other teachers in the County. From 1980 to 1983, he was President of Elementary Physical Educators, Fairfax County, and in 1987, he was nominated for the Teacher of the Year Award. As a teacher with twenty-one years of experience, he enjoyed "tenure," that is, he could only be dismissed for cause.[3]

After O'Rourke's therapist-father reported her repressed memories to the authorities, a phone "sting" was set up by the Fairfax County Police Department on April 19, 1993. Ms. O'Rourke telephoned G. with the police listening in and accused him of sexually molesting her when she was his student in third grade. G. emphatically denied her accusations numerous times, and when she threatened to go to the police, he told Ms. O'Rourke that he would tell them the same thing. After the phone sting, G. was asked to talk with the police. Accompanied by his wife, he did so, again denying the charge. Offended by the police interrogation tactics, G. consulted the Fairfax Education Association who put him in touch with counsel. Through his counsel, he arranged to accept an arrest warrant before a magistrate on May 13, 1993. Immediately after G. was charged,

---

[2] G. also appeals on the ground that CPS and DSS failed to comply with various time requirements mandated by Title 63.1. That issue is controlled by *J.B. v. Brunty*, 21 Va. App. 300, 464 S.E.2d 166 (1995), which holds that the time requirements are procedural not directory. As G., by counsel, requested a delay in the initial finding proceedings and has failed to demonstrate that the subsequent failures were anything but harmless error, the Court declines to reverse on this ground. *Id.*

[3] *See* Va. Code Ann., Title 22.1, Chapter 15.

the police put out a release notifying the press that G. had been arrested and charged with aggravated sexual battery of Erin O'Rourke. Fanned by the media, a firestorm of publicity quickly enveloped G. and the Virginia Run Elementary School. The principal sent out a letter to all parents notifying them of G.'s arrest; teachers were detailed to direct any students into counseling that were seen or heard discussing Mr. G.; students were released from class for counseling; and television crews and reporters interviewed students at bus stops. After his arrest, G. was placed on administrative leave without pay.

For the lack of probable cause, the Erin O'Rourke charge was dismissed at the preliminary hearing stage on August 27, 1993.[4] This did not resolve G.'s situation. As a result of the frenzy of publicity surrounding his arrest, twenty-three students accused G. of inappropriately touching them. On May 17, 1993, the Fairfax Department of Human Development, Child Protective Services ("CPS") and the Fairfax police began their investigation of these charges.[5] Although the CPS police manual required that an alleged abuser be notified of a CPS investigation,[6] at the request of the police, G. was not notified of the allegations until July 19, 1993. On August 4, 1993, the Commonwealth's Attorney's office notified CPS that it would not be prosecuting any of the cases CPS was investigating. Nonetheless, the CPS procedures continued, and in the fall of 1993, CPS made its findings.[7] Those findings involved six students who were all interviewed at least twice for periods ranging from one hour to one hour and forty-five minutes. No recordings of these interviews were maintained,[8] and notes from one interview were destroyed.

By letters dated September 10, 1993, September 24, 1993, October 1, 1993, and October 8, 1993, CPS notified G. that it had made determina-

---

[4] *See* Va. Code Ann., § 16.1-241(I).

[5] The investigation was jointly concluded with the Fairfax County Police Department, Criminal Investigations Bureau as authorized by Va. Code Ann. § 63.1-248.6(F). When as here a schoolteacher is involved, the principal of the school is notified of the allegations, and the school is requested to cooperate in the CPS investigation. Services Manual, Virginia Department of Social Services, Volume VII, Section III, Chapter A (Child Protective Services), page 68 (hereinafter cited as "CPS Manual").

[6] CPS Manual, page 16.

[7] CPS investigations are supposed to be completed within forty-five days. Va. Code Ann. § 63.1-248.6(E)(7); CPS Manual, page 17d.

[8] CPS did tape interviews with G.'s attorney apparently because G.'s attorney was taping the interview. Va. Code Ann. § 63.1-248.6:2.

tions of founded, level 1, sexual abuse in the case of Amy Shutz, Sarah Ingalsbe, Regina Zeuner, Catherine Parfitt, and Kristie Hebert, and reason to suspect in the case of Lisa Stephens. By letter dated October 11, 1993, CPS notified the Superintendent of Schools of these findings.[9] Mr. G. was not allowed to resume his teaching position.[10]

After being notified of the CPS findings, G. requested an "informal conference" pursuant to VR 615-45-2 and Va. Code Ann. § 63.1-248.6:1.[11] The conference was held on November 19, 1993, and was presided over by Thomas S. Hamblen, a CPS supervisor. At this hearing, G. was considered an appellant, although the burden of proof at the hearing is unclear.[12] He could not subpoena witnesses and was not allowed to cross examine the two CPS workers who made the six dispositions. On December 6, 1993, Mr. Hamblen upheld the findings in a two-page memorandum opinion, finding that the children were reliable and trustworthy, had personal knowledge of the incidents, and were without malice toward G. who had failed to present any evidence that the children falsified or distorted events of sexual abuse or that they had any motive to fabricate their stories.[13]

G. then appealed to DSS pursuant to Va. Code Ann. § 63.1-248.6:1.[14] DSS designated Carolyn E. Carlson as the Hearing Officer to hear G.'s

---

[9] This is required, CPS Manual, page 70, as was a notification of the findings to the Commonwealth's Attorney. Va. Code Ann. § 63.1-248(E)(5); CPS Manual page 29.

[10] After public hearings, the Fairfax County School Board terminated G.'s employment on July 19, 1994. G. is challenging that decision in a separate proceeding, *G. v. Fairfax County School Board*, At Law No. 138508.

[11] The informal conference and the other DSS proceedings were not subject to the 1995 amendments to Chapter 12.1 of Title 63.1 of the Virginia Code.

[12] No statute or regulation provides the burden of proof. According to DSS, the purpose of the conference is to allow the appellant, his counsel, and the agency "an opportunity to meet informally . . . to [r]esolve their differences about the disposition of the CPS investigation, [e]xplore fully the agency's disposition and reasons for it, [and] [e]xplore fully the alleged abuser's additional information about the investigation and disposition." CPS Manual, page 57. Hamblen's decision implies, however, that G. bore the burden of proof.

[13] None of the children appeared at the Local Conference. Appearing for CPS were Ms. Iddings, a CPS supervisor, Ms. DeFife, the CPS social worker responsible for the Parfitt and Zeuner investigation and findings, and Mr. Robey, the CPS social worker responsible for the Hebert, Ingalsbe, Schutz, and Stephens investigation and findings.

[14] Under the statutory scheme, G. had the burden of showing by a preponderance of the evidence that the record contains information which is irrelevant or inaccurate regarding

appeal.[15] Ms. Carlson conducted hearings on March 31, 1994, May 5, 1994, August 25, 1994, August 29, 1994, September 26, 1994, September 29, 1994, and October 20, 1994. On December 30, 1994, Hearing Officer Carlson issued her opinion sustaining the CPS findings. At these hearings, G. did produce evidence that went to the reliability and trustworthiness of his accusers and that four of them had motives to fabricate their stories. Unlike Mr. Hamblen who based his decision in part because G. failed to introduce such evidence, Ms. Carlson noted that "it is unfortunate that a byproduct of the appellant's case was his belief that it was necessary to discredit the reputations of these children." In light of the record, the Hearing Officer found there was "clear and convincing evidence that Catherine Parfitt, Kristie Hebert, Sarah Ingalsbe, Amy Shutz, and Regina Zeuner were sexually abused by the appellant, and this resulted in or was likely to have resulted in serious harm to them." This appeal followed.

## II. *The Factual Findings*

The duty of this Court with respect to issues of fact is limited to determining whether there was substantial evidence in the DSS record upon which DSS could make its findings. Va. Code Ann. § 9-6.14:17. The Court cannot substitute its judgment on the factual issues decided by DSS. *State Board of Health v. Godfrey*, 223 Va. 423, 434-35, 290 S.E.2d 875, 881 (1982).

Here DSS found that G. had failed to prove by a preponderance of the evidence that the founded-level one dispositions should be set aside because they were based on information that was irrelevant or inaccurate. Level one "includes those injuries/conditions, real or threatened, that result in or were likely to have resulted in serious harm to a child." VR 615-45-1 § 2.1.A. The seriousness of a level one disposition is highlighted in the CPS Manual which advises that the kinds of injuries and conditions that could result in a level one finding are those which:

> Require medical attention in order to be remediated; the injury is to the head, face, genitals, or is internal and located near a vital organ. Injuries located in more than one place; the injuries were caused by the use of an instrument such as a tool or weapon; and

---

the commission of abuse, and therefore, the record should be amended. Va. Code Ann. § 63.1-248.6:1.

[15] Carlson is a manager for CPS Appeals and Fair Hearings, Bureau of Customer Services.

> an inappropriate drug was administered or a drug was given in an inappropriate dosage . . . .
>
> For sexual abuse, the situation would be one where there was genital contact, or force or threat was used, or the abuse had taken place over a period of time and there were multiple incidents.

CPS Manual at page 17d-17e. The harm to the victim and egregious conduct required for a level one finding is further illustrated by the CPS Manual description of the kind of injuries and conditions that could result in a level two finding:

> For sexual abuse, minimal or no physical touching but exposure to masturbation, exhibitionism, etc. Caretaker makes repeated sexually provocative comments to the child; child is exposed to pornographic materials.

CPS Manual at page 17f. The record in this case utterly lacks any evidence of the kind of serious harm or the likelihood of serious harm that would justify a level one finding. It is replete with reports that G.'s alleged actions made the five young girls feel "uncomfortable" or "weird" but is equally replete with notations that the alleged victims are doing "fine." In a letter submitted after the January 3, 1996, hearing, DSS argues that as there was evidence that some of the touches took place over a period of time and there were multiple incidents, the necessary criteria for a level one finding were met.[16] But this argument ignores the DSS regulation that requires injuries or conditions that result or are likely to result in serious harm to a child in order to place an individual's name in the CANIS registry for eighteen years. The CPS Manual cannot eviscerate that requirement by simply equating multiple touches to serious harm. There was no evidence adduced that could justify a level one finding in any of the five cases before the Court.

While none of the findings can stand in view of the above defect, after reviewing all the record, the Court also independently finds there was not substantial evidence to justify a finding in the Regina Zeuner case. The incident relied upon for the finding took place in gym class[17] and involved

---

[16] In fact, two of the five findings (Zeuner and Shutz) involved a touching on only one occasion. CPS letter to Robert R. Spillane, Superintendent of Schools, dated October 11, 1993.

[17] Nonetheless, there were no witnesses to this incident.

an allegation that G. had touched or cupped Ms. Zeuner's breasts. In order to make a finding of sexual abuse, CPS was required to determine by clear and convincing evidence that G. committed any act prohibited by Va. Code Ann. §§ 18.2-61 to 18.2-67.10 or Va. Code Ann. §§ 18.2-351 to 18.2-371.[18]

> "Sexual abuse" means an act committed with the intent to sexually molest, arouse, or gratify any person where:
> a. The accused intentionally touches the complaining witness' intimate parts or material directly covering such intimate parts
> . . . .

Va. Code Ann. § 18.2-67.10. Ms. Zeuner informed G.'s investigator[19] that "I don't know if he knew his hands were there, but it made me uncomfortable."[20] The Hearing Officer apparently ignored this undisputed statement, but, given the fact that the complaining witness stated that G. may not have known his hands were touching her breasts, this Court finds that there was not substantial evidence of an intentional touch in the case of Regina Zeuner.

In view of the limited role this Court has in reviewing the DSS fact-finding, the Court must leave the other findings of fact as they stand. The Court is constrained to note however that it doubts whether a neutral fact-finder would have reached the same conclusions as CPS and DSS under the clear and convincing standard.

### III. *Due Process*

Independent of this Court's reversal based upon the lack of substantial evidence supporting the DSS dispositions, this Court finds that the procedures employed by DSS fail to comply with constitutional due process requirements. The parameters of due process in the context of a CPS/DSS investigation and determination are set forth in *Jackson v. W.*, 14 Va. App. 391, 419 S.E.2d 385 (1992), and *Turner v. Jackson*, 14 Va. App. 423, 417 S.E.2d 881 (1992). Two queries must be answered: first, has G. been deprived of a liberty or property interest and second, if so, what process or procedures are required in order to satisfy the Fourteenth Amendment.

---

[18] CPS Manual, page 8, page 17d.

[19] Ms. Zeuner was the only accuser that G. or his agents were able to interview. Ms. Zeuner willingly spoke with G.'s agent, Ms. Carmen Saphos, on November 6, 1993.

[20] G. denied any such touching.

## A. *Protected Interests*

DSS concedes that "there is no more deplorable badge of infamy a person can wear than that of being a child abuser," *Jackson v. W.*, 14 Va. App. at 408, 419 S.E.2d at 395, but argues that as the *Jackson v. W.* court refused to find a due process deprivation, this Court should hold that G. has failed to satisfy the first due process prong. In *Jackson v. W.*, the record lacked any evidence of damage to appellee's dentistry practice, and as the central registry information was confidential, there was no reasonable likelihood that the finding would become available to his patients. 14 Va. App. at 409-11, 419 S.E.2d at 396-97. In contrast, here the G. findings were required to be reported to the School Superintendent.[21] DSS contends that as the School Board dismissed G. in separate proceedings, the DSS findings, placed in a confidential registry, could not be held to affect any protected interest of G. That argument ignores the fact that when CPS began its investigation in 1993, no School Board proceedings had commenced, and, as a teacher was involved, a finding would require a CPS report to the Superintendent. It is inconceivable to this Court that any superintendent anywhere would or could ignore a report that it had been found that one of the system's teachers had sexually abused children under his or her care. Moreover, it requires no speculation to hold that such a finding involving a teacher would not only damage that teacher's career, it would end it.

DSS also argues that because its findings are placed in a confidential registry, they cannot affect any protected interest of G. Yet, registry information can be and is disclosed. Va. Code Ann. § 63.1-248.8. Although the registry is not "open to public inspection," regulations dictate "appropriate disclosure," as when DSS discloses information to the administrator of an institution in cases involving alleged abuse by an institution employee. CPS Manual at page 54. Anyone, including employers, can obtain the information with the permission of the person being investigated. Anyone like G. with a "founded" disposition cannot win: if G. grants permission, an employer will choose not to hire him; if G. denies permission, the employer will assume a founded disposition exists, with the same result. Unlike a dentist's patients in *Jackson v. W.*, a teacher's employer has every incentive to check the registry to protect the children under his or her care.

---

[21] CPS Manual, page 70. In addition, CPS investigation procedures require that at the outset of the investigation, "contact will be initiated with the administrator (or other official designee) of the employee's school." CPS Manual page 68.

*See Jackson v. W.*, 14 Va. App. at 409-11, 419 S.E.2d at 396-97. G.'s loss of future employment is guaranteed by the "founded" disposition, contrary to DSS's claims. As DSS personnel concede, when a teacher's name is put into the registry, "there's a job at stake."

## B. *Procedures Required to Satisfy the Fourteenth Amendment*

Due process requires "no particular form of procedure" and is examined in the context of specific cases. *Klimko v. Virginia Empl. Comm'n,* 216 Va. 750, 760, 222 S.E.2d 559, 568 (1976), *cert. denied,* 429 U.S. 849 (1976). To determine appropriate procedures, this Court must balance "(1) the private interest at stake; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Commonwealth's interest, including the function involved, and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Jackson v. W.,* 14 Va. App. at 412, 419 S.E.2d at 397. DSS relies on the court's *dicta* in *Jackson v. W.,* concluding that the relevant procedural protections are adequate. *Id.* In *Jackson v. W.,* however, the court weighted the government's important interest in protecting children against the complainant's nonexistent property or liberty interest.[22] *Id.* Unlike *Jackson v. W.,* as this Court finds, anyone in G.'s position has protectible property and liberty interests. Given these interests and the Commonwealth's obvious interest in protecting children, this Court must examine the risk of erroneous deprivation through the current procedures and the probable value, if any, of additional procedural safeguards. G.'s strongest claims are that he should have been allowed to cross-examine the complainants and should have faced an impartial decision maker.

G. claims he has a right to cross-examine his accusers. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to . . . cross-examine adverse witnesses." *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970). In a case similar to G.'s, *Thomas*

---

[22] The Virginia Appeals Court stated "W. cannot identify any interest, recognized by the due process clause, that will be affected by the proceedings. On the other hand, the government has an important interest in preventing child abuse and neglect." *Jackson v. W.,* 14 Va. App. at 412, 419 S.E.2d at 397-98. Thus, without fully discussing the procedures used by DSS or the complainant's actual notice and opportunity to be heard, the court stated the department's investigatory function outweighed the complainant's interest and concluded that the "challenged procedures are constitutionally adequate." *Id.*

*v. Ward*, 529 F.2d 916, 919 (4th Cir. 1975), a teacher was discharged after an informal meeting based upon unsworn letters written by school officials, Thomas' personnel file, and affidavits from the assistant principal and several students, some of whom were discipline problems. Thomas presented witnesses on his own behalf, but the Fourth Circuit held this did not sufficiently protect the teacher's rights. *Id.* "[W]hile the right to confront and cross-examine live witnesses does not necessarily attach to every administrative hearing . . . we conclude that Thomas could not constitutionally be terminated without such an opportunity." *Id.* The court noted, "the termination decision turned on the truth or falsity of disputed facts"; and, "[i]n almost every such setting, due process requires an opportunity to confront and cross-examine adverse witnesses."[23] *Id.*

As the record demonstrates, the dispositions against G. depend upon disputed facts supported exclusively by the testimony of the child-complainants. G. never had the opportunity to cross-examine these complainants.[24] Neither the adjudicator nor the Hearing Officer actually witnessed or heard the children speak. Instead, they relied exclusively upon the unsworn[25] written reports and oral statements of three CPS workers, Robey, DeFife, and Iddings. Robey and DeFife recalled interviews that they and other CPS workers had conducted. In the two cases where Robey did not conduct the initial interviews, Robey recalled either her conversations with the worker who conducted the interview, or the notes from the other worker.[26] In an attempt to refute this hearsay testi-

---

[23] See also *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959) (stating the right to cross-examination is most important "where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.")

[24] As noted above, G.'s agent informally interviewed Ms. Zeuner once, and Ms. Zeuner indicated that G. did not intentionally touch her.

[25] None of the statements made before the local conference adjudicator and Hearing Officer were under oath. The Hearing Officer specifically rejected G.'s request that all witnesses in the hearing testify under oath, stating "[t]hat is not practiced in our hearings. Our department specifically does not administer oaths." The revised statute authorizes a hearing officer to administer oaths to all parties and witnesses. Va. Code Ann. § 63.1-248.6:1(B) (1995).

[26] Robey failed to attend the initial interviews of Amy Shutz and Kristie Hebert. She then failed to talk to the CPS worker who conducted Shutz's first interview. Robey did talk to the worker who interviewed Hebert, since all the interview notes were destroyed. Nonetheless, Robey concluded in the Shutz and Hebert reports that the statements in the first and second interviews were "consistent."

monial evidence, G. presented the only evidence he could: e.g., evidence from the teacher with whom G. taught, Ms. Blanchard, and students in his classes that he never engaged in any improper conduct; evidence from the school board investigator and police reports finding no corroboration of any of the allegations, even though numerous incidents allegedly occurred in open gym;[27] evidence from Blanchard and other students that the door and blinds to G.'s office with Blanchard were always open, contrary to several allegations; and significant evidence that four of the five girls had poor reputations for truthfulness and had been disciplined by G. in class.[28] Despite G.'s evidence, the adjudicator and Hearing Officer upheld the findings because the girls' statements were apparently "consistent." In conclusion, the Hearing Officer stated: "[t]he most relevant factors to be considered in evaluating all of the evidence in this matter are the similarities in the girls' descriptions of the way Mr. G. touched them, the girls' consistent statements to the agency, and their credibility as viewed by the agency." Without examining the exact statements made by each complainant, a person in G.'s position cannot challenge the "consistency" of the statements. Thus, he cannot possibly challenge the findings against him. In a case like this where the decision rests exclusively upon testimonial evidence by the complainants, the accused must be afforded some means of challenging the complainants' statements to probe into and demonstrate inconsistencies in the complainants' statements,[29] their perceptions,[30] and possible bias.[31] When the accused has no opportunity to directly question

---

[27] For example, according to Robey, Kristie Hebert claimed she was improperly touched approximately 240 times, often in open gym.

[28] A private investigator, Mr. Yohe, concluded from his interviews with other students and teachers that Ingalsbe, Parfitt, Hebert, and Zeuner were part of a seven-person clique that considered gym class a social hour. G. had reprimanded these four in class for their lack of participation in gym activities. Yohe stated that Ingalsbe was particularly angry with G. for criticizing her in class.

[29] For example, Amy Shutz stated in one interview that G. was sitting at his desk when she entered the room and was touched by G.; in another interview, she said G. was at Ms. Blanchard's desk, on the other side of the room.

[30] For example, according to G.'s investigator, Mr. Yohe, Amy Shutz stated in an interview with one school counselor initially that she "felt something" touch her bottom. In a later interview with CPS workers, she stated G.'s hand touched her.

[31] In G.'s case, bias may have been demonstrated given the undisputed evidence that four of the five girls had been disciplined in class by G.

the evidence against him, there is a significant risk that the accused will be erroneously deprived of a protectible interest.

On the other hand, G.'s need for cross-examination must be viewed in the context of sexual abuse proceedings involving young children. Yet, there are ways to protect both the children and G.'s rights; "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); *see Klimko v. Virginia Empl. Comm'n*, 216 Va. 750, 760, 222 S.E.2d 559, 568 (1976) (stating that "[d]ue process requirements 'are not technical, nor is any particular form of procedure necessary'.") At a minimum, CPS and other officials conducting interviews of the complainants should audiotape the interviews and give transcripts to the accused. The accused can challenge the statements directly to determine whether inconsistencies exist, and he can challenge the interrogation techniques which may taint the complainants' perceptions[32] or subtly pressure the child-complainant into providing answers the child believes the interviewer wants to hear.[33]

Providing transcripts to the accused will enhance the agency's accuracy. The current procedure of note-taking during interviews is wholly inadequate.[34] For example, in an interview of Amy Shutz by school board investigator Alan Barbee and CPS worker Robey, Barbee noted that Amy said "[s]he didn't tell Mary what happened, because she wasn't sure what happened," according to an investigator's review of Barbee's notes. Yet, Robey stated at the hearing she did not remember any such statement by Amy; Robey's notes only state: "Amy said she didn't say anything to anyone after it happened." Barbee's notes raise serious questions about the alleged touching, but Robey's notes do not. Requiring CPS and DSS to

---

[32] See *State v. Michaels*, 642 A.2d 1372 (N.J. 1994) (directing the trial court to hold a pre-trial hearing to determine the reliability of the child-complainants' statements, given that the interrogation techniques "may have irreparably tainted the children's perceptions of the events through unduly suggestive questions, coercion, or other improper influence").

[33] One child who had been interviewed by police and CPS stated she had been pressured by the interviewers. Beverly Brockman apparently stated to investigator Yohe that a police officer called her a liar for denying any touching, and the officer tried to pressure her to say that G. did touch her inappropriately.

[34] The police report for Kim Gallagher, another one of G.'s students, stated that Kim said G.'s hands were "all over her butt." Gallagher stated in the hearing that she never said this, she had never been improperly touched by G., and had never seen G. touch anyone improperly.

audiotape the interviews will enhance accuracy without imposing an undue burden. By allowing the accused to examine the exact statements made by the complainants, the accused can defend against the so-called "consistent" statements. This will likely conserve administrative resources by eliminating incredible allegations early in the proceedings.

G. claims the bias of Defendant-DSS further deprived him of his right to due process. This Court agrees. An "impartial decision maker is essential" for due process. *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970); *See Klimko v. Virginia Empl. Comm'n*, 216 Va. at 760, 222 S.E.2d at 569. While it is not improper *per se* for an employee of an administrative agency to adjudicate the agency's cases, the record here demonstrates actual bias against G. *Hladys v. Commonwealth*, 235 Va. 145, 147-48, 366 S.E.2d 98, 99-100 (1988). The CPS workers investigated the complaints by interviewing the complainants and made their dispositions. G. appealed the findings to a local conference adjudicator, a CPS supervisor,[35] for an informal hearing that lasted three hours. G.'s second appeal was in front of Carolyn Carlson, a manager for CPS Appeals and Fair Hearings, Bureau of Customer Services of DSS. This appeal, his third, represents his first opportunity to defend himself before a neutral body.

The CPS workers' conduct demonstrates the need for a neutral fact finder. CPS workers are not charged with finding the truth, but with protecting children, so if they err they naturally err on the side of the children. The workers did not review any of the complainants' school records, including disciplinary records. They never interviewed the teacher with whom G. taught his classes, Ms. Blanchard. They did not interview the single witness, Mary Gikas, who may have corroborated or discredited Amy Shutz's allegations. More seriously, the workers mailed a booklet on young girls and sexual abuse to Amy Shutz and her parents on June 24, 1993, although G. was not even notified of the investigation until July 19, 1993, and was not interviewed until after that date. The accompanying note states that: "Amy might want to take a look at it." And well before the workers interviewed G. or any of his co-workers, they referred Catherine Parfitt to a "victim assistance network." Because these communica-

---

[35] Although inapplicable in G.'s case, the appeals statute has been revised to require a neutral local conference adjudicator: "With the exception of the director of the local department, no person whose regular duties include substantial involvement with child abuse and neglect cases shall preside over the informal conference." Va. Code Ann. § 63.1-248.6:1 (1995).

tions demonstrate that the investigators had found sexual abuse existed before they completed their investigation and before they interviewed the alleged perpetrator, they amply demonstrate the bias of the CPS investigation. In addition, the workers improperly considered the allegations of Erin O'Rourke as corroborative of their findings, without interviewing O'Rourke, even though the O'Rourke allegations had been dismissed for lack of probable cause.[36] At G.'s insistence, the CPS reports were amended to delete references to O'Rourke only after the local conference, almost three months after the charges had been dismissed.[37] Moreover, in the summary of findings of each complainant, both Robey and DeFife stated: "Mr. C.G. denies any touching and cannot give a reasonable explanation as to why his hands would be touching [complainant]." Neither worker offered a plausible explanation of this impossible requirement which put G. in Kafkaesque bind and dramatically demonstrates the lack of a disinterested fact-finder in the CPS finding process.

The Hearing Officer upheld the CPS workers' dispositions. In reaching her decision, the Officer discounted the testimony of a private investigator, two independent psychologists,[38] and substantial undisputed evidence from numerous witnesses that four of the five girls had poor reputations for truthfulness and had been disciplined by G. in class. The Officer did not discuss the alleged "serious harm" that the abuse supposedly has caused, even though a level one finding is defined as abuse that "result[ed] in or [was] likely to have resulted in serious harm to a child." CPS Manual at page 17d. She did not mention the complete lack of evidence on the issue of G.'s "intent to sexually molest, arouse, or gratify any person." Va. Code Ann. § 18.2-67.10. She denounced G. for introducing evidence that impeached the complainants' credibility. She also suggested that G. would

---

[36] The workers claimed the allegations were "similar" to those made by the complainants. The only similarities between the allegations would be that O'Rourke was one of G.'s students and the abuse allegedly occurred in his office during school hours. O'Rourke claimed she and G. were naked on top of his desk during the school day in an office that had no blinds on the windows.

[37] A magistrate dismissed the charges on August 27, 1993, the "founded" dispositions were made from September through October, and the conference was held on November 19, 1993.

[38] Carlson commented that Dr. Carter exhibited "strong bias against the girls" preventing her from giving his testimony the "weight that more objective professional testimony would have been accorded." Note that Dr. Carter has worked in a county children's center and a county social services department, *inter alia*.

not remember details about his students unless he gave them "special attention," i.e., abused them.[39]

Based upon the foregoing evidence, this Court concludes the CPS workers and Hearing Officer denied G. due process. The revisions in the statute related to the appeals process may well prevent such a denial from appearing in future appeals of other parties, see Va. Code Ann. § 63.1-248.6:1 (1995), but here the demonstrated defects and documented shortcomings of the proceedings require reversal of the findings.

## IV. *Attorneys Fees*

G. has requested that he recover his costs and attorney fees pursuant to Va. Code Ann. § 9-6.14:21. The Court finds that G. has substantially prevailed on the merits of his appeal and that DSS acted unreasonably in the proceedings below. If the parties cannot agree on the reasonableness of G.'s costs and fees, they shall obtain an evidentiary hearing date to determine an award. *See Mullins v. Richlands Nat'l Bank*, 241 Va. 447, 403 S.E.2d 334 (1991).

The Court is aware of its duty under the strictures of Va. Code Ann. § 9-6.14:19. However, the defects in the proceedings below cannot be cured by a remand to DSS, as a verbatim transcript of the interviews with the alleged victims was not kept, a minimum requirement of due process in the context of this case. Therefore, the findings are hereby reversed, and DSS is directed to remove them from the CANIS registry. *Ames v. Town of Painter*, 239 Va. 343, 389 S.E.2d 702 (1990); *Jane Doe v. D.S.S.*, 33 Va. Cir. 538 (Prince William County 1992); *J.L. v. Jackson*, 25 Va. Cir. 106 (Gloucester County 1991).

---

[39] She stated: "It does not appear likely that a teacher would recall such details about former students, particularly a teacher with a lengthy teaching career and numerous students. Such detailed recollections would be likely, however, if particular students were given special attention." There was no basis in the record for this finding.